# Richmond

ANDREW DICKERSON v. COMMONWEALTH OF VIRGINIA.

November 24, 1947.

Record No. 3293.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*Howard H. Carwile,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

This case is before us on a writ of error to a judgment of the lower court whereby the plaintiff in error was sentenced to fifteen years imprisonment in the State penitentiary, pursuant to the verdict of a jury convicting him of the murder of Percy White.

The evidence shows that the homicide occurred under these circumstances: After supper on the evening of December 20, 1946, Obelia Robertson went to the home of Blanche Ellis, near Springfield road in Henrico county, in order to have her hair dressed by Blanche's daughter, Ellen. Accompanying Obelia were her husband, Jeigo Robertson, their son, Grayson, and Obelia's uncle, Andrew Dickerson, the accused.

Shortly after the arrival of this party at the Ellis home, Ellen Ellis began dressing Obelia's hair. Soon Percy White came in. During the previous weeks White had been supplanted by Dickerson in the affections of Blanche Ellis. Being jealous of Dickerson's presence at the Ellis home, White resented it with an oath. Apparently, however, Dickerson paid no attention to this incident and although both men had been drinking there was no show of violence between them at that time. Blanche Ellis retired to her bed-

room, and Jeigo Robertson fell asleep in the room where his wife was having her hair dressed.

Sometime later, the evidence does not indicate the approximate hour, an argument broke out between Dickerson and White. These two seem to have been in a room apart from the other witnesses and no one testified as to how the quarrel commenced. Attracted by the argument, Grayson and Obelia Robertson started toward the room where the two men were. They saw White strike Dickerson in the face with his hand. Dickerson promptly retaliated by striking White, and although the witnesses saw no weapon in Dickerson's hand, White staggered into the next room, bleeding from a wound in the breast. He exclaimed that he had been mortally stabbed by Dickerson and that Blanche Ellis was the cause of the tragedy.

Jeigo Robertson was aroused, and with the assistance of Dickerson put White into a truck and the three started for the Medical College of Virginia hospital, in Richmond. Jeigo drove the truck while Dickerson supported White. When the party arrived at the hospital shortly before 12:45 a. m., White was dead. An examination showed that he had been stabbed several times in the chest by a sharp instrument which had pierced the heart, causing death.

The knife or instrument with which the stabbing was done was never found. Two days after the tragedy Jeigo Roberston found in the truck, between the seat and the back, a pistol which he identified as being the property of White. How, when, or by whom it was placed there was not shown. However, there is no evidence that this weapon was exhibited on the night of the tragedy.

Dickerson's testimony is to the effect that he was so drunk on the night in question that he had no recollection of what happened at the Ellis home. While he admitted that on previous occasions he and White had quarreled because of Blanche Ellis, on the night of the tragedy he (Dickerson) did not remember having had any argument or exchange of blows with White, and had no recollection what-

soever of having cut or stabbed the latter. Indeed, Dickerson said that he did not own or carry a knife. Moreover, he said, he did not recall having helped Jeigo Robertson put White into the truck. He began to sober up, he said, on the way to the hospital.

However, the police officers who interviewed both Jeigo Robertson and Dickerson at the hospital, testified that Dickerson was quite sober and did not appear to have been drinking.

Dickerson was indicted for the murder of White and was prompty brought to trial. There was a verdict of guilty in the following language: "We, the jury, find the accused guilty as charged in the indictment and fix his punishment at fifteen (15) years imprisonment in the State penitentiary."

The form of the verdict was, of course, defective in that it failed to "fix the degree" of murder of which the accused was found guilty, as required by Code, section 4919. However, no point was made of this either in the lower court or before us.

The record shows that the jury were instructed that under the evidence they might have found the accused guilty of murder in the first degree, murder in the second degree, voluntary manslaughter, involuntary manslaughter, assault and battery, or that they might have found him "not guilty."

They were likewise properly told what punishment they might inflict upon the accused in each instance. Specifically, they were instructed "that murder in the second degree is punished by confinement in the penitentiary of this State for not less than five years nor more than twenty years." Code, section 4395.

It is apparent from the form of the verdict, which fixed the punishment of the accused at fifteen years in the penitentiary, that the jury found him guilty of murder in the second degree.

In *Hobson* v. *Youell*, 177 Va. 906, 915, 15 S. E. (2d) 76, 79, we held that where there could be no doubt as to the degree of the offense of which an accused had been con-

victed, a judgment sentencing him to fifty years' confinement in the penitentiary on a plea of guilty to a short statutory form of indictment,, charging murder, was not fatally defective because the degree of murder was not expressly stated therein. Hence, we said (177 Va., at page 915, 15 S. E. (2d), at page 79): "Fifty years' confinement in the penitentiary clearly indicates that the court ascertained the petitioner to be guilty of murder in the first degree."

And continuing, we quoted with approval the following from 30 C. J. 431: "According to the weight of authority, even where the jury are required to specify the degree of guilt in their verdict, a verdict which does not expressly find the degree may nevertheless be valid if the assessment of punishment clearly indicates such degree." See also, 41 C. J. S., Homicide, section 404, p. 427.

In accordance with the principles enunciated in that case we hold that the verdict here was not fatally defective.

Although the assignments of error include a specification that the verdict is contrary to the law and the evidence, this assignment is not pressed. Manifestly, the evidence on behalf of the Commonwealth amply supports a verdict convicting the accused of murder in the second degree.

Without objection, five instructions were given at the request of the Commonwealth, and seven at the request of the accused. The main assignment of error is that the lower court should have given two additional instructions, both dealing with self-defense, which are copied in the margin.[1]

---

[1] "INSTRUCTION No. A.

"The court instructs the jury that it is not essential to the right of self-defense that the danger should in fact exist.

"If to the defendant it reasonably appeared that the danger in fact existed he had the right to defend against it to the same extent and under the same rule which would obtain in case the danger had been real.

"The defendant may always act upon reasonable appearance of danger, and whether the danger is apparent or not is always to be determined from the standpoint from which the defendant viewed it at the time he acted.

"The question for the jury in this case is not whether the taking of the life of the deceased might have been safely avoided, but whether the accused might reasonably have believed, or did believe, it necessary to cut

■ In our opinion neither instruction should have been given. There is no evidence that the fatal blow was struck in self-defense. The accused admitted, on cross-examination, that in so far as he knew, the deceased did not threaten him and did nothing to him. Indeed, he said, he had no recollection whatsoever of what had occurred.

"Instruction No. A" is designed to be predicated upon evidence that "it reasonably appeared" to the accused that he was in danger of death or of serious bodily harm at the hands of the deceased. There is no such evidence here. On the contrary, the testimony of the accused himself is that he apprehended no such danger.

"Instruction No. B" is designed to be predicated upon evidence that "the accused was unjustifiably and feloniously assaulted," and that in that case he had the right to "stand his ground and repel force by force," and "use such force as to him" seemed "reasonably necessary to repel the attack, even to the taking of the life of the assailant."

Here, there is no evidence that the accused was feloniously assaulted, or that he was attacked in such a manner as justified him in taking the life of the deceased.

The testimony of the eyewitnesses is that the deceased struck the accused in the face with his hand and that the accused retaliated with a blow to the chest of the deceased. This latter blow turned out to have been a fatal stab with a sharp instrument.

■ It is elementary that in order to justify a killing in self-defense, the type of act committed by the deceased must be one from which the accused must have believed

as he did, resulting in the death of the deceased, in order to save his own life, or avoid serious bodily harm."

"INSTRUCTION No. B.

"The court instructs the jury that if you believe from the evidence that the accused was unjustifiably and feloniously assaulted, he does not have to retreat but may stand his ground and repel force by force and may use such force as to him may seem reasonably necessary to repel the attack, even to the taking of the life of the assailant, and it is not necessary that it should appear to the jury to have been necessary."

and must have had reasonable ground to believe, at the time, that he was in imminent danger of death or of great bodily harm at the hands of the deceased. *Perkins* v. *Commonwealth, ante,* p. 867, 44 S. E. (2d) 426, and cases there cited.

 A single blow struck with the hand, under the circumstances detailed here, did not justify the taking of human life in self-defense.

Complaint is made that the trial court improperly allowed the attorney for the Commonwealth to cross-examine three witnesses introduced by him, as to alleged prior inconsistent statements made by them, without first obtaining the leave of the court to do so, as required by Code, section 6215.

During his cross-examination by counsel for the accused, Jeigo Robertson, for the first time, told of finding in the truck, two days after the homicide, the pistol which he said was the property of the deceased. On redirect examination Robertson was asked by the attorney for the Commonwealth whether he knew how the weapon happened to be in the truck. His reply was, in substance, that the deceased must have had it in his pocket.

This question and answer were objected to by counsel for the accused on the ground that it was improper cross-examination by the Commonwealth of its own witness. No further questions were asked and the examination terminated there.

Not only did the cross-examination end upon objection, but such disclosure as the witness had made was favorable and not prejudical to the accused.

During the direct examination of Grayson Robertson by the attorney for the Commonwealth, this witness, after answering a question propounded to him and telling of the exchange of blows between the deceased and the accused, volunteered the statement that he had heard the deceased say that "he was going to get Andrew," the accused.

Over the objection of counsel for the accused, the Com-

monwealth inquired whether the witness had told the investigating officers of this threat by the deceased against the accused. His reply was that he had made no statement whatsoever to the officers who had not interrogated him on the subject of the homicide. When pressed further, he said that he had told counsel for the accused of the threat.

Here, too, the effect of the admitted testimony was favorable and not prejudicial to the accused. He had the benefit of having the jury told that his life had been threatened by the deceased and that the witness had related the incident to the only person—counsel for the accused—who had interrogated him on the subject.

The third incident of this character complained of occurred during the direct examination of Obelia Robertson by the attorney for the Commonwealth.

After this witness had related the exchange of blows between the two men, she continued: "Percy said, 'I been stabbed one time through the God damn heart. I'm gone this time. Goodbye, Blanche. You are the cause of it.'"

After several questions, which clearly indicated to the trial court that he had been taken by surprise by the last statement, the attorney for the Commonwealth said: "I asked her what happened. * * * I am not going to tell what was said, but I did talk to the witness and I have been taken by surprise. She did not tell me this, and that is why I am cross-examining her on that."

Upon this explanation the court allowed the attorney for the Commonwealth to proceed with the cross-examination of the witness, the result of which was to show that she had not made this statement either to the attorney for the Commonwealth, or counsel for the accused, or the investigating officers.

Just why the attorney for the Commonwealth and the trial court deemed the statement of the witness to be "adverse" to the prosecution is not clear. It seems to us that it was quite favorable to the Commonwealth's case in that it tended to show that the killing was brought about by the

jealousy of the two men over the affections of Blanche Ellis. That being so, when it developed during the cross-examination of the witness, of which complaint is made, that she had not previously related the incident to any one, some doubt at least might have been raised in the minds of the jury as to whether the incident really had occurred. In other words; the cross-examination was benficial and not prejudicial to the accused.

It is not necessary that we decide whether the incidents complained of come within the purview of Code, section 6215, or whether the cross-examination of these witnesses was technically justified and proper. It is perfectly clear from an analysis of the incidents that nothing occurred during the cross-examinations, and no evidence was developed thereby, which was prejudicial to the case of the accused.

The final assignment of error arose in this manner: In ruling on the propriety of the cross-examination of Obelia Robertson by the attorney for the Commonwealth, the trial court said, in the presence of the jury: "If this witness is perjuring herself I think he has a right to show it."

It is contended that this was an improper indication to the jury by the court that it thought that this witness was not telling the truth.

This, of course, was not the purpose of the court's remark. It was merely in answer to the objection of counsel for the accused that the cross-examination of this witness was improper.

While counsel for the accused objected to the ruling permitting such cross-examination, he made no objection to the court's remark on the ground that it reflected on the credibility of the witness.

Had the court's attention been directed to the possible prejudice which the accused might have suffered by reason of the remark, it would have then been given the opportunity of making clear to the jury the purpose and effect of its ruling, and of telling them that the remark was not

intended and should not be considered by them as a reflection upon the credibility of the witness.

Indeed, the point now urged was not brought to the attention of the trial court in any manner or at any time, and hence under Rule 22 of this court the accused is not entitled to raise it for the first time on appeal.

On the whole we find no error in the judgment complained of, and it is

*Affirmed.*