CHARLES DUNN, JR., Plaintiff, v. MAYOR AND COUNCIL OF CITY OF WILMINGTON, Defendant.

(*July* 30, 1965)

LYNCH, J., sitting.

*Oliver V. Suddard* and *Richard Allen Paul* (of Wise & Suddard), for plaintiff.

*O. Francis Biondi,* City Sol., and *Stephen Potter,* Asst. City Sol., for Mayor and Council of Wilmington.

Superior Court of Delaware, for New Castle County. No. 3113 Civil Action 1964.

LYNCH, Judge.

The record before the court reflects that Charles Dunn, Jr. was arrested on June 13, 1964, on view by a Wilmington Police Officer, charged with the commission of the offense of disorderly conduct; that on June 15, 1964 a criminal information entitled "INFORMATION FOR DISORDERLY CONDUCT" was filed by the Office of the City Solicitor in the Municipal Court of the City of Wilmington, charging:

"* * * that Charles Dunn, Jr. * * * on the 13th day of June 1964 with force of arms, at the City of Wilmington * * * and within the jurisdiction of the Municipal Court, for the City of Wilmington, unlawfully did commit a common nuisance to-wit: Did act in a disorderly manner, at 9th and Madison Street, contrary to and in violation of City Ordinance 63 020 Sec. No.2 Para. (sic) against the form of an Ordinance of 'The Council' of 'The Mayor and Council of Wilmington' in such case made and provided, and against the peace and dignity of the State."

The record further shows that defendant Dunn, on July 27, 1964, entered a plea of Guilty to the information and that he was given a sentence of 30 days imprisonment. The record further shows that—

"AND NOW TO-WIT: This Twenty-seventh Day of July, A.D. 1964, the Defendant, Charles Dunn, Jr. was thereupon committed to the custody of the State Board of Corrections."

On July 30, 1964 certiorari proceedings were instituted. On the same day Dunn filed bond, in the amount of $800.00, with surety,

conditioned that he prosecute his certiorari proceedings to effect. The Writ of Certiorari issued on July 31, 1964. The record of the Municipal Court was filed with the Prothonotary of this Court on August 7, 1964. Exceptions were filed to the record on September 23, 1964[1] and read as follows:

"1. The record is deficient in that the information fails to properly charge an offense since it does not inform plaintiff, defendant below, of the act or acts which constituted the offense.

"2. The record is deficient in that the Ordinance with which plaintiff, defendant below, was charged is unconstitutional since it is vague, unclear and indefinite as to what act or acts constitute its violation.

"3. The record is deficient in that it discloses that plaintiff, defendant below, was sentenced to a term of imprisonment, which is unlawful since Municipal Court has no authority or jurisdiction to sentence a person to prison per se for a violation of a City Ordinance.

"4. The record is deficient in that it does not contain a commitment order as required by 11 *Del. C.* Sec. 6542."

At the common law, there was no offense known as Disorderly Conduct, 27 C.J.S., Sec. 1(1), page 507 and 12 Am. Jur. 2d, page 684; see also Vol. 2, Wharton Cr. Law and Procedure, Sec. 805. It is an offense only if made so by statute or ordinance, 27 C.J.S., page 507 and 12 Am. Jur. 2d, page 684. Misconduct of a character as to constitute a public nuisance was indictable, *State v. Sherrard*, 117 N.C. 716, 23 S.E. 157 (Sup. Ct. 1895).

It was said by the Court of General Sessions in *State v. Lafferty*, 5 Harr. 491 (1854) (Lafferty had been indicted for assault and battery

---

[1]Rule 12 (aa 1), Superior Court Rules of Civil Procedure, *Del. C.* provides that exceptions in certiorari must be served within 10 days after filing of the record. It would appear that defendant Dunn did not comply with the Rule and the City Solicitor could have filed Motion to Remand.

on a City Watchman,)—

"By the Court.—The watchmen of Wilmington are officers to put a stop to disorder in that city; and if necessary, to arrest and detain disorderly and riotous persons. Such officers have the right, and it is their duty, to arrest all drunken and disorderly persons who are disturbing the public peace. It is their duty to arrest even persons who are not drunken, if by their noise and disorder they are disturbing the public peace and annoying the citizens generally. * * *."

It was not until passage of 25 Del. Laws, Ch. 247, approved March 26, 1909, that disorderly conduct was made an offense against the State of Delaware, and then that law provided the offense was referred to as a "nuisance". 11 *Del. C.* Sec. 471, formerly 25 Del. Laws, Ch. 247, applies, as did the original law, only "outside the limits of any incorporated city or town"; the statute condemns any person who "brawls, quarrels, uses abusive, obscene, threatening or profane language in a loud tone of voice, or is intoxicated in any public place * * *." In the enactment of our present Code the provision making the offense a nuisance was eliminated.

The City of Wilmington has long had the power to define nuisances and to ordain laws "to provide for the safety of the citizens" of the City and since the law has for a long time treated the offense of disorderly conduct as a "nuisance", I cannot imagine that counsel for Defendant Dunn challenges the power of "The Council" to create and define the offense of "Disorderly Conduct" or to ordain laws providing for the safety of its citizens. The City's Charter—prior to the adoption of the present Home Rule Charter, which became effective July 1, 1965—also provided that "The Council" had power—

"* * * in general * * * to do all those matters and things for the well-being of the said City which shall not be in contravention of any existing laws of this State or the Constitution thereof. * * *."

In fact, counsel by letter to the court concedes the City's power to ordain such an offense—raising only the question of the City's power

to provide for penal sanctions, such as imprisonment, for persons who violate such an Ordinance.

By Ordinance[2] dated December 17, 1896 it was provided:

"SEC. 2. Whoever shall, in any street * * * public place [or place of public amusement] in this city, be guilty of any indecent or disorderly conduct or make any offensive outcries or loud noises, or utter, [act] or sing any lewd, scurrilous, profane, obscene words, [acts] or songs [or shall permit any person to utter, act or sing any lewd, scurrilous, profane, obscene words, acts or songs, in any place of public amusement in this city, of which he is the owner, manager, proprietor or lessee] or shall write or make any indecent or obscene words or figures upon any fence, building or other public place [or shall place, post or cause to be placed or posted any indecent or obscene figure, picture, poster or representation upon any fence, building or other public place], [or shall print, or cause to have printed, or keep, or cause to be kept, or serve or circulate, or cause to have served or circulated, for the purpose of sale, show or gratuitous offering, any newspaper or paper-writing, containing, either in express or plain words, or by intimation, suggestion or innuendo, any indecent, lewd, scurrilous, profane or obscene words, songs, figures or pictures, of or about, any person, place or thing] within the city, or shall drop, place, deposit, spirt or spit upon any door step in this city, any dung, tobacco, spittle or other noisome or filty substance, shall be deemed guilty of a common nuisance, and liable to a fine of not less than [one] and not exceeding [fifty] dollars.

"[It shall be the duty of the Chief of Police, upon the conviction of any one, for placing or posting or causing to be placed or posted, any indecent or obscene figure, picture, poster or representation upon any fence, building or other public place, to cause the same to be immediately removed.]"

[2]The court believes there was an earlier ordinance but it is not presently available, all early records of Wilmington having been sent to the Public Archives.

Whatever may have heretofore been done by the City in ordaining a law condemning disorderly conduct, "The Council" ordained and made disorderly conduct unlawful and an offense by an Ordinance approved July 26, 1963. The pertinent provisions are set forth:

"SECTION 1. *Legislative Findings.* In order to protect the public safety and security of the residents and citizens of the City of Wilmington it is hereby declared to be unlawful for any person to commit any of the following acts as hereinafter defined.

"SECTION 2. *Disorderly Conduct.*

(1) No person shall disturb the peace by:

"(a) Being intoxicated in a public place.

"(b) Participating or abetting in any rude, indecent, riotous, drunken[3] or violent conduct.

"(c) Using any vulgar, obscene or abusive language in any public place.

"(d) Committing any obscene, indecent or immoral act in any public place.

"(e) Inciting any other person to commit any breach of the peace.

"(f) Drinking intoxicating liquor in a public place other than premises licensed to sell intoxicating liquor for consumption on the premises.

"* * *.

---

[3] The police records show that Dunn was arrested for drunken and violent conduct, and for using profane and abusive language in a public place.

"SECTION 6. *Penalties for Violation.*

"Any person violating any of the provisons of this Ordinance shall, upon conviction, be punished by fine of not less than $25.00 nor more than $100.00, or by imprisonment in the New Castle Correctional Institution for a period of not more than 90 days, or by both fine and imprisonment."

This was the Ordinance violated by defendant, to which violation he pleaded guilty in the Wilmington Municipal Court.

■ Statutes and Ordinances defining the offense of disorderly conduct and imposing punishment for such an offense, are designed to preserve peace and good order and are a valid exercise of the police power. *City of Pineville v. Marshall,* 222 Ky. 4, 299 S. W. 1072, 1074, where the Kentucky Court of Appeals (1927) observed:

"* * *. 'Disorderly conduct' is a term commonly used in municipal ordinances * * * to designate an offense below the grade of a common-law misdemeanor. It is a broader term than that of breach of the peace or nuisance. It may include either of these, but it also embraces conduct and words not constituting a breach of the peace or nuisance. It is not capable of exact definition; * * *."

*Comm. v. Publicover,* 327 Mass. 303, 98 N.E. 2d 633 (1951); *State v. Burkitt,* 120 N.J.L. 393, 200 A. 1005 (N.J. Supreme Ct., 1938); *State v. O'Donnell,* 200 A. 739 (N.J. Supreme Ct., 1934). In this case the New Jersey Supreme Court said, 200 A. at page 741, among other things:

"* * *. The act is clearly a valid exercise of the police power."

*Hackney v. Comm.,* 186 Va. 888, 45 S.E. 2d 241 (Sup. Ct. of Appeals, 1947). At 45 S.E. 2d 243, the Virginia Court said, in passing, that "* * * the dominant purpose of [the statute's enactment] was to preserve peace and good order. * * *"

Counsel for Dunn argues that his conviction was erroneous in that—

1. The information fails to charge the offense with particularity;

2. The ordinance is vague, unclear and indefinite;

3. The record does not include a commitment order as required by law.[4]

### 1. *Sufficiency of Information*

Rule 1, Criminal Rules of the Superior Court, *Del. C.* Ann., makes those rules applicable to proceedings in the Municipal Court for the City of Wilmington. Rule 12(b)(2) of such rules, provides, as follows:

"Defenses and Objections Which Must be Raised. Defenses and *objections based on defects* in the institution of the prosecution or in the indictment or *information* other than that it fails to show jurisdiction in the court or to charge an offense *may be raised only by motion before trial.* * * *. Failure to present any such * * * objection as herein provided constitutes a waiver thereof. * * *" (Emphasis supplied)

The contention that the charge made in the information was vague was one that had to be raised at the original trial in the Municipal Court. This was not done; Dunn, through his attorney, entered a plea of guilty to the information which plaintiff charged Dunn with disorderly conduct. Since he was arrested on view, it has to be presumed that the defendant was aware of the reasons leading up to his arrest so that he knew how to plead to the charge made against him

---

[4] This point was abandoned by plaintiff after oral argument and the court had commenced preparation of this opinion.

by the information. This defense, clearly, was waived under the rules of Rule 12(b)(2) because of Dunn's failure to raise any question of defect in the information. *State v. Adair,* 1 W. W. Harr. 558, 562, 117 A.20, 22 (Ct. of Gen. Sess. 1922); *Holloway v. State,* 6 Terry 288, 72 A.2d 238 (Superior Court, 1950), in which Justice Carey of our Supreme Court, while a member of this court, ruled in a certiorari proceeding, that entering a plea to an alleged defective criminal proceeding "constitutes a waiver" of the defect; see also *Martin v. State,* 10 Terry 344, 345, 116 A.2d 685, 686 (Superior Court, 1955).

## 2. *Vagueness of the Ordinance*

This contention is likewise without merit. An examination and analysis of the Ordinance, supra, page 600, show, contrary to Dunn's contentions, that the Ordinance is plainly worded and describes the specific acts which are condemned as constituting disorderly conduct. A study of the decisions to be found in 12 Am. Jur. 2d, pp. 684 to 692 and in 27 C.J.S., pp. 507 to 523, convince me of the sufficiency of the Ordinance.

The sense of the rule requiring that criminal laws not be vague is founded upon two separate concepts. One, that no man should be held criminally responsible for conduct which he could not reasonable understand to be proscribed, *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S. Ct. 126, 127, 70 L. Ed. 322 (1926) and *U.S. v. Harriss,* 347 U.S. 612, 617, 74 S. Ct. 808, 98 L. Ed. 989 (1954). I rule that the Ordinance meets this test. Secondly, the defendant must be informed of the charge against him, so that he can plead to it and prepare a defense against it, *Musser, et al. v. State of Utah,* 333 U.S. 95, 68 S. Ct. 397, 92 L. Ed. 562 (1948). If the ordinance meets these tests it is not unconstitutional on the ground of being vague. The criteria that sets the guide lines for the analysis of statute's or ordinance's constitutionality is stated in 1 Wharton's Criminal Law and Procedure (Anderson Ed. 34-35).

"A statute is not unconstitutional as indefinite because it employs general terms, when such terms convey to a person of ordinary

understanding and intelligence an adequate description of the prohibited act, for impossible standards of certainty are not required. Reasonable certainty is sufficient."

■ I rule here that the Ordinance advised Dunn that he was charged with disorderly conduct in violation of a cited Ordinance, which specifically condemns the enumerated acts set forth therein. If he wanted the State to point to the particular paragraph or paragraphs on which the prosecution was based, Dunn had available to him the aid afforded by the rules. Rule 7(e) of our rules would have permitted the City to amend the information by furnishing Dunn with all the information he might have sought. Since he did not avail himself of his remedies in the Municipal Court, Dunn, in a sense would now divest the City of a right granted to it under the rules and Dunn has made no showing that he has been prejudiced because of his failure to act in the Municipal Court.

Dunn's "big" point in his brief, and at oral argument, was that the City of Wilmington had no power to ordain an Ordinance providing for the imposition of a prison sentence for violation of the Ordinance by those who violate such an Ordinance. He contends that there is no express power delegated to the City to so ordain a law. Dunn relies entirely on *Keefe, State ex. rel. v. Schmiege,* 251 Wis. 79, 28 N.W. 2d 345, 174 A.L.R. 1338 (Wis. Sup. Ct., 1947). In that opinion the Wisconsin Supreme Court said, in part, 28 N.W. 2d at page 348:

"* * * the legislature may confer upon the boards of supervisors power to create civil actions to recover fines for the violation of county ordinances. * * * As an adjunct to punishment by fine 'not as a part of the punishment, strictly speaking, but as a means of enforcing payment of the fine and costs—that is, of making the element of punishment effective,' * * * the legislature may authorize the imprisonment of defendants in such civil action in case of failure to pay fines imposed. * * *"

Then the Court concluded, 28 N.W. 2d at page 349, that:

"* * * the power cannot be granted cities and counties to use imprisonment other than for the purpose of collecting or enforcing the collection of a fine."

It is to be noted that the Wisconsin Court treated the entire matter as involving sovereignty and said, 28 N.W. 2d at page 348:

"By definition long antedating the constitution of this state, a crime has been defined as an offense against the sovereign and a criminal action 'one prosecuted by the state against a person charged with a public offense committed in violation of a public law.' * * A criminal action is prosecuted by the state against a person charged with a public offense, for the punishment thereof. Every other is a civil action.' A county is not a sovereign, and to permit it to create a crime is to raise it to the dignity of a sovereign. * * *"

Later on the same page at 348—

"We shall not unduly extend this opinion by speculating whether this section authorizes the delegation by the legislature of essentially sovereign powers because the delegation of such powers is to the counties as state agencies and falls far short of making sovereign states out of counties. The sovereign alone can create a crime. A misdemeanor is a crime * * *, and since sec. 85.84 Stats. delegates to the counties power to create a crime, it is void as an attempt to confer sovereignty upon the counties. * * *"

It is somewhat difficult for me to accept and fully comprehend the reasoning of the Wisconsin Court. In one breath the Court states that its municipalities may only provide for payment of fines by those who violate its Ordinance and may not utilize the sanctions of imprisonment for punishment for those who violate their Ordinances, yet in the next breath the municipalities can "'as a means of enforcing payment of the fine and costs—that is, of making the element of punishment effective,' * * * the legislature may·authorize the imprisonment of defendants in such civil actions in case of failure to

pay fines imposed * * *." 28 N.W. 2d at page 348. See 13th Amendment to U. S. Constitution.

There may be some difference or distinction that I am unable to discern. In any event I am in no way persuaded by the decision and reject it as unrealistic and illogical.

The annotation—174 A.L.R. 1338 and subsequent decisions—show that the Wisconsin case is unique in the law and apparently there is no other like decision. The annotation discusses the question of the delegation of authority to municipal corporations to provide for punishment by imprisonment for violations of ordinances, and at page 1344 a summary of the annotation is stated:

"* * *. That it has been a general practice for municipalities to enact ordinances declaring certain acts to be crimes and providing for their punishment is too clear for argument. This fact is attested by the literally hundreds of cases in which the courts have construed such ordinances or discussed questions of their validity as against objections other than the power of legialatures to delegate the right to enact them. The validity of such ordinances as against the latter objection has, except in a few cases, passed unchallenged.

"Where the question has been considered, almost without exception the legislative power to delegate authority to municipalities to enact ordinances declaring their violations to be crimes and providing for punishment upon conviction, has been sustained."

1 McQuillin, Municipal Corporations (3d Ed.[5]) discusses the factor of sovereignty and where it is vested. At pages 347-348 may be found the statement—

"In our system the term 'the people' means a body politic, a corporate unit forming a compact organized society, and acting as a

------

[5] All references are to the same edition.

political entity by and through representatives, who constitute, for the time being, the public authority to whom is confided the duty of carrying out the sovereign will of the society, either in making, executing or construing the rules and regulations comprehensively termed laws. * * *. Under our form of government, therefore, the repository of ultimate sovereignty is in the people, not as so many distinct individuals but in their political capacity only. 'The people,' therefore, in political and legal theory, are the supreme law-givers, law-interpreters, and law-administrators. In them resides the law-making, law-interpreting, and law-enforcing power. But their will is expressed in the Constitution, and must prevail in all governmental action, because no officer, agent or department can run counter to it unless and until changed by a change in the Constitution in the way they have agreed upon. * * *."

A footnote found on page 347, reads:

"'The government consists of associated persons, representing the sovereign who make, interpret and enforce the laws. The American system of government is founded upon the fundamental principle that the citizen is the fountain of all authority.'"

The statement is taken from *City of Chicago v. Tribune Co.*, 307 Ill. 595, 139 N.E. 86, 90, 28 A.L.R. 1368 (1923), and the further language of the court is of much interest.

McQuillin, Vol. 1 at Sec. 11.106 discusses the legal status of municipal corporations and then proceeds:

"The municipal corporation is a public institution, a political organ, designed to promote the common interests of the inhabitants in their organized capacity as a local government. That a city or town can exercise no other than public powers results from the fact that it is a public institution created and existing to serve the general interests of the people residing or coming within the city area, not as private individuals but a members of the political society. The Supreme Court long ago tersely described the city as 'a miniature state.'

"This conception differs widely from the view frequently taken, due to inexact thinking, that a city or town is not a governmental organ at all, but is simply a 'business corporation,' or organization designed to give service, and to be managed on what are termed 'business principles' in somewhat the same manner as the private corporation is controlled by its board of directors, or as is often the case, by a select few for the wole purpose of pecuniary profit. Some of the writings on the subject are replete with expressions to the effect that 'cities in their organic capacity are chiefly large corporations rather than integral parts of the state.'

It scarcely need be said that this view has never been favored by the law nor has it influenced judicial decisions. Early the Supreme Court took the position that the city is a public institution, created for public purposes only and hence has none of the peculiar qualities and characteristics of a trading company instituted for purposes of private gain except of course, that of acting in a corporate capacity. With emphasis this tribunal says: 'Its objects, its responsibilities and its powers are different.' * * *."

Blackstone, Vol. 1, page 35 (Sharswood Ed., 1859) makes this statement of law:

"By the sovereign power, * * *, is meant the making of laws for wherever that power resides, all others must conform to and be directed by it, whatever appearance the outward form and administration of the government may put on. * * *."

Originally, all power in the exertion of governmental activity over the citizenry both foreign and domestic, was termed "the police power". The police power is defined by Blackstone[6] to be the power which concerns "the due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood and good manners, to be decent,

---

[6] Sharswood Ed., Book IV, page 162.

industrious and inoffensive in their respective stations". Consequently we must regard the term "police power", in its original and most comprehensive meaning, as denoting the power of government in every sovereignty, as embracing the power to govern men and things; it is an inherent attribute of sovereignty, necessary to the effective conduct and maintenance of government. It is, moreover, the power to regulate the conduct of people one toward another, and the manner in which each shall use his own property, when regulation becomes necessary for the public good. Consequently, it is the power—still speaking broadly—to enact and enforce laws and regulations requiring each person so to conduct himself and use his property so as not unnecessarily to injure another. It authorizes control of the citizen or other subject with respect to his relations to the state or the municipal corporation, and for this reason, police regulations are enforceable by fine and imprisonment. The police power embraces governmental competency to prefer the public good over private interests. 6 McQuillin, Municipal Corporations, Secs. 24.01 and 24.02. The conclusion necessarily follows that the police power is inseparable from legislative power.

The Delaware Courts have, on a number of occasions, recognized that municipalities of this state possess at least some attributes of sovereignty—if sovereignty can be split up or fragmentized. Former Judge Terry, later Chief Justice of our Supreme Court, had this to say (1950) while a judge of this Court in *Del. Liquor Store v. Mayor & Coun.*, 6 Terry 461, 467, 75 A.2d 272, 275:

"Municipal enterprises relating to the preservation of peace, * * *, are among those enterprises generally classified in the category of governmental functions. * * *"

Judge (later Chief Justice) Terry ruled in the cited case that the City of Wilmington was immune from suit for personal or property damages caused by a Fire Engine. In explaining the reasons underlying the rule, Judge Terry noted, 6 Terry at page 466, 75 A. 2d at page 274:

"Several reasons have been advanced for immunity granted to

municipal corporations when acting in a governmental capacity: (1) 'The State is sovereign and the municipality is its governmental agency.' * * *"

In *Mayor & Coun., etc. v. Vandegrift*, 1 Marv. 5, 17, 29 A. 1047, 1049, 25 L.R.A. 538 (Ct. of E. & A., 1893) the Court of Error and Appeals (later abolished and its functions vested in our Supreme Court) said of the liability of the City for personal injuries sustained in a sled accident:

"The decision of this question depends upon the solution of a preliminary question, which is whether such officers were, in respect to such a police duty, the agents or servants of the state, or of the city in its corporate capacity. * * * The preservation of the peace is one of the most important functions of state governments, and it makes no difference to what tribunal that duty or power is intrusted. It is still essentially a matter of public concern, and does not lose its public character. To commit any of the offenses within the city of Wilmington, of which the municipal court thereof is given sole and exclusive jurisdiction, would be an infraction of the laws of the state, and therefore against its peace and dignity, and punishable by said court, as it would be in the state court having general jurisdiction of the same according to the general provisions of law in that behalf."

See also *Miller v. Town of Seaford*, 22 Del. Ch. 159, 163-166, 194 A. 37, 39, (Ct. Ch., 1937) wherein the late Chancellor Wolcott spoke of "The town [of Seaford] * * * [and said it was] entitled to all the rights and immunities which appertain to the State, a branch of whose sovereignty * * * has been bestowed by the State upon it. * * *"

In light of these decisions, there can be no doubt as to a municipality possessing sovereignty and, in my opinion, this would certainly apply to matters involving what would ordinarily be regarded as breaches of the peace, now by ordinance, and making disorderly conduct on the public streets of Wilmington unlawful and an offense, punishable as provided in the ordinance.

 It is my opinion, therefore, that municipal corporations such as Wilmington, when acting in their governmental capacity, act in a sovereign capacity, and have the power to see to enforce the peace on its streets—a form of police power—by such ordinance.

 Sometimes municipal ordinances proscribing certain conduct are not typically classified as "crimes", but are classified or referred to for want of another term as simply "offenses"[7]. Regardless of the terminology used, I rule that where municipal corporations are granted the "police power", they can legislate to set up ordinances of a penal nature with penal sanctions, which include the power to imprison, for reasonable terms, those found guilty of violating such ordinances.

Under the patent incorporating the Borough of Wilmington, the Burgesses were given legislative powers "in managing the affairs of said Borough, and the keeping of peace and good order therein * * *". *Cf. Gray v. State of Delaware*, 2 Har. 76, 88, 94 (1836). In 1772, in 1 Del. Laws, at Chapter 106, Page 481, there can be found a statute which amended the then existing Charter of the Borough of Wilmington, but no modification of existing powers seemed to be intended. It would appear that the legislature, in major part merely intended to re-enact the powers contained in the Patent of 1739. The reason for assuming that no modification of existing powers was intended is that this statute contained a whereas clause which reviewed the powers which had been granted to the Burgesses in 1739, and did not otherwise revoke these powers with respect to the removal of nuisances and the power "to arrest, imprison and punish rioters and other breakers of the peace". The Constitution of Delaware of 1776 did not revoke or in any way modify the law as it had existed prior to it with respect to the City of Wilmington. Article 24, Constitution 1776.

---

[7]Neither the prior ordinance or Ordinance No. 63-020 makes disorderly conduct a crime, but only a "nuisance" or "unlawful", at most an "offence". These "offences" are sometimes referred to as "police regulations" and it has been held, *City of Chicago v. Coleman*, 254 Ill. 338, 98 N.E. 521 and *City of Chicago v. Williams*, 254 Ill. 360, 98 N.E. 666, that a police regulation is not within the protection of the Thirteenth Amendment.

Sections 9 and 10 of Article 8 of the Constitution of Delaware of 1792 preserved all "rights, privileges, and immunities" of corporate bodies, and other existing laws. The 1831 Constitution, art. 7 Secs. 8, 9 had language of like meaning and import.

In 1832, Vol. 8 Del. Laws, Chapter CVIII, enacted a statute entitled "A supplement to the act entitled 'An act to alter and re-establish the charter of the Borough of Wilmington'." By it the name was changed from borough of Wilmington to city of Wilmington. Section 5 of this law constituted "the members of Council" as "the legislative body of the said city, * * *".

Section 8 of this law provided:

"That all the powers and authorities vested by the act to which this is a supplement, or by any other act of the General Assembly of this State, in the present borough council shall be, and are hereby vested in the city council."

Section 13 of this law in part provided:

"That all the powers, privileges, rights or jurisdictions of the corporation shall remain as heretofore; * * *."

Section 17 of this law, so far as it is pertinent, provided:

"That the mayor and alderman and president of the city council, or any two of them, shall have full power and authority to inquire of, hear, try and determine, agreeably to the laws and constitution of this State, all larcenies, assaults and batteries, riots, routs and unlawful assemblies, nuisances and other offences, which have been committed or shall be committed within the said city, and to punish all persons who shall be convicted of the same offenses or any of them, agreeably to the laws of this State; and also to inquire of, hear, try and determine all offenses which shall be committed within the said city against any of the laws, ordinances, regulations, or constitutions of the said city, and to punish the offender and offenders as by the said laws, ordinances,

regulations or constitutions, shall be prescribed or directed; * * * or to commit to prison as occasion shall lawfully require, * * * and for the purposes aforesaid, the said mayor and alderman and president of the city council, or any two of them, shall have full power and authority, and they are hereby vested with full power and authority to hold and keep a Court of Record within the said city * * * to be regulated by ordinance of the said city council, by the name and style and title of the Mayor's Court for the city of Wilmington, for the inquiring, hearing, trying and determining of the pleas and matters aforesaid, and for the punishing of those who shall be guilty thereof, and for the causing of all encroachments in the streets of the said city, and all nuisances to be removed, and for the punishing the offenders as the law and usage shall in such case require, and for the doing and performing all such other matters and things as are in and by this act made cognizable in the said court. * * *."

Section 18 of this law provided:

"That the said Mayor's Court shall have full power and authority to inquire of, try and finally determine, all those criminal matters enumerated in the fifteenth section of the sixth article of the amended constitution, without indictment by grand jury, and with or without trial by petit jury as shall be provided by the ordinances of the said city."

Note is to be taken of the language of Section 32 of this act, which read:

"That this act shall be deemed and taken to be a public act, and shall be judicially taken notice of as such, by all judges and justices and all other persons whatsoever, without the same being specially pleaded; and *every matter and thing herein contained, shall be construed and taken most favorably and beneficially for the said corporation.*" (Emphasis supplied)

By Vol. 17 Del. Laws, Ch. 207 (1883) and 18 Del. Laws, Ch. 660 (1889), the Statutes of Delaware relating to Wilmington were

revised and consolidated, and later amended. Thereafter, such statutes were loosely referred to and known as the Charter of the City of Wilmington. They were revised and set up in 1942 as the Revised Code of Wilmington, 1942.

By the cited state statutes, the City's powers were enlarged and broadened. "The Council" of the then "Mayor and Council of Wilmington" was named as the legislative body of the City and its powers enumerated. For instance, "The Council" was empowered "to provide for the safety of the citizens," and "in general [it] shall have power to do all those matters and things for the well-being of the said City which shall not be in contravention of any existing law of this State or the Constitution thereof."

I pause here to note the ruling of this Court in *McCaffrey v. Thomas,* 4 Pennewill 437, 440, 56 A. 382, 383 (1903) when similar language appearing in the Charter of the Council of Milford was construed—the Court saying:

"* * * Under section 11, c. 161, p. 277, vol. 18, Laws Del., entitled "An act to incorporated [sic.] the town of Milford,' it is provided 'that said town council shall have authority to make such regulations and ordinances for the government of the town as they shall deem proper and necessary.' Under such provision, we think said town council had the power to adopt the ordinance making it an offense for any one 'to be drunk, noisy and disorderly within the limits of said town.'"

It may be that the General Assembly has not explicitly granted power to the City of Wilmington to ordain ordinances providing for penal sanctions, by way of imprisonment, as to those who violate its ordinances but I am satisfied from a review of the several laws, from the 1739 Patent to the date when Dunn violated the present ordinance vesting legislative powers in the City Government, a grant of the "police power" was sufficiently included in the City's power and has never been revoked and, therefore, the City has been granted power, in the exercise of such police power, to adopt ordinances

condemning Disorderly Conduct, supra 4 and 5, as an "offence" and to provide appropriate penalties, including reasonable terms of imprisonment.

In *Poynter v. Walling*, 177 A. 2d 641 (Super. Ct., 1962) a town ordinance of Elsmere made driving an automobile, under the influence of intoxicants, a crime, and provided for fine and/or imprisonment for its violation. A writ of prohibition was sought in the Superior Court to stop a prosecution under the ordinance.

At pages 646 and 647 of 177 A. 2d the Court, per Judge Storey, discussed two principal questions. One was whether the town had power to legislate on the subject and declare conduct of the character involved criminal, i. e., imposing financial and/or penal sanctions, and the second was if the adoption and enforcement of this ordinance was a violation of the rule that a town or city possesses no inherent power to create ordinances making conduct criminal that there must be an express grant of power.

Judge Storey said that the Enabling Act, incorporating the Town of Elsmere, gave the Town Council police power under a general welfare clause, i. e., to preserve the "peace and order", and the "protection and preservation of public and private property". See *McCaffrey v. Thomas*, supra.

It is to be noted that the Enabling Act, giving the Town of Elsmere power to provide for the general welfare, was no different in substance than the purpose clause of the original patent granted to the City Fathers of Wilmington by King George II in 1739, and in subsequent enactments. By this cited patent, what was then known as the Borough of Wilmington, now the City of Wilmington, was incorporated. Its purpose was to "promote trade, industry, rule and good order". Nor is the statement in the Enabling Act for the Town of Elsmere different in substance than the power vested in the Burgesses in the City of Wilmington to make rules for "managing the affairs * * * and keeping of peace and good order".

The Court, in the Poynter case, held that the Elsmere ordinance was lawfully adopted and Elsmere had the power to make such conduct criminal, and to impose a prison sentence, and that such was "fairly implied" from the Enabling Act alone. Therefore, it seems clear, under Delaware law, that the power to create and impose criminal penalties includes the power to imprison for violation of municipal ordinances and this power need not be expressly delegated, but can be implied if it appears that the municipality's power to adopt such an ordinance is in the exercise of the "police power".

At 11 *Del. C.* Sec. 5702(a), we find that the Municipal Court may "punish all persons, who commit offenses within the City against any of the laws, ordinances * * * of the City, in the manner prescribed by such laws, ordinances * * *." In 11 *Del. C.*, Sec. 5702(b), it appears that, "[t]he Court may impose fines according to law * * * or may commit the prisoner, as the occasion lawfully requires * * *".

These descriptions are somewhat different in words or substance from the original grant of power to the Burgesses in the 1739 Patent, but no different in words than the power vested in the Mayor's Court in the 1832 Charter, and subsequent revisions. In light of this history of legislation, I think it proper to conclude the General Assembly of the State of Delaware vested the City with power to imprison for violations of a City Ordinance, which power has always been thought to exist, or at least since 1832.

The exceptions are overruled and the judgment of the Municipal Court is affirmed. An order may be submitted so expressing these views and remanding the case to that Court.