### Richmond

## LEROY CUNNINGHAM

v.

## COMMONWEALTH OF VIRGINIA

No. 0476-85

Decided May 20, 1986

COUNSEL

Joseph W. Kaestner (Bell and Kaestner, on brief), for appellant.

Russell Williams, Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

**COLE, J.**—This appeal raises two issues: (1) whether the prosecutor's persistence in questioning a witness after he had invoked his fifth amendment right against self-incrimination denied appellant a fair trial; and (2) whether the trial court erred by unfairly examining defense witnesses. Finding no error, we affirm.

Upon his trial by jury, the appellant, Leroy Cunningham ("Cunningham"), was convicted of robbery, malicious wounding and use of a firearm in the commission of a crime. He received sentences of seventeen years in the state penitentiary.

The Commonwealth's evidence showed that on April 12, 1984, Horace Monroe, the sixty-two year old victim, was walking home from the grocery store when he noticed a man leave the Baker Street School playground and position himself on the sidewalk ahead of him. Monroe stated that he watched the man carefully as he passed within two feet of him on the sidewalk because of his peculiar behavior. Immediately after passing the man, Monroe

testified that he heard a gunshot from behind him. As he turned instinctively to look back, a second shot pierced his right eye and passed through his nose. Monroe fell to his knees, and although he was bleeding from his right eye, he testified that he could see clearly through his left eye. Monroe stated that he again observed the face of his assailant who was now within six inches of him searching for Monroe's wallet. After a brief struggle, Monroe surrendered his wallet, containing fifty-two dollars in cash, and his assailant fled on foot to meet two other men. All three men ran from the area. Monroe could not identify the two other individuals, but he described the man who shot him as an 18 year old black male, having a medium dark complexion and a thin mustache, and wearing a blue gym suit with white stripes down the arm and leg. He later identified Cunningham as his assailant from a photographic spread and testified at trial that there was no question in his mind that Cunningham was the perpetrator.

I.

The Commonwealth called as a witness Leroy "Weasel" Clements who, according to the Commonwealth's theory of the case, was one of the two individuals who fled the area with Cunningham following the shooting. Clements, although not charged with any crime in connection with the shooting, was represented by counsel. As his defense, Cunningham attempted to show that Clements was actually the gunman who shot Monroe. On advice of counsel, Clements answered five preliminary questions. He then invoked the fifth amendment and refused to answer the following questions propounded by the Commonwealth:

Were you out on Baker Street School playground on April 12, 1984?

Did you shoot Horace Monroe?

Isn't it true, sir, that you, in fact, saw the shooting of Horace Monroe?

Did you and James Rome and this man, were you all involved in that shooting?

Isn't it true that you and James Rome and this man were all together, and he said he was going to go over and rob the little old man coming over the bridge; isn't that true?

Didn't you and James Rome run off after this man was shot?

On cross-examination, Clements continued to refuse to answer any questions. Counsel for Cunningham asked the court to direct Clements to answer his questions, but the court declined to do so. Cunningham's counsel asked the following questions, to which Clements pled the fifth amendment:

Do you recall telling Douglas Cunningham that you were the man who shot Horace Monroe?

Mr. Clements, do you recall meeting with James Rome on the evening of April 12, the date of the robbery?

Do you recall telling James Rome at that time that you were the man who shot Horace Monroe?

Do you recall meeting with the defendant on the sidewalk and James Rome at that time telling the defendant that you were the person who shot the old man?

Mr. Clements, if you were not involved in this, why would it incriminate you to tell this jury what you were doing and what you saw?

Cunningham contends that by continuing to question Clements after a fifth amendment privilege claim had been made, the prosecutor unfairly implanted his guilt in the minds of the jury, thereby prejudicing his defense. Cunningham contends that he was deprived of his constitutional right to confront the witness.

█ The fifth amendment does not provide a blanket right to refuse to answer any questions. Once a witness asserts his fifth amendment right, some investigative questioning must be allowed,

for it is well settled that the "prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous." *Namet* v. *United States*, 373 U.S. 179, 188 (1963). By its language, the fifth amendment privilege pertains only to situations where an individual is compelled to become "a witness against himself." The Constitution of Virginia likewise confers a right to a witness to be free from being compelled "to give evidence against himself." Va. Const., art. I, § 8.

■ The question whether the privilege is properly invoked is one for the trial court. As stated by the Supreme Court in *Hoffman* v. *United States*, 341 U.S. 479 (1951):

> The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself — his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, . . . and to require him to answer if 'it clearly appears to the court that he is mistaken.'

*Id.* at 486 (citations omitted).

The Commonwealth's theory of the case was that Clements possessed nonprivileged information that could properly be used to corroborate its case. This theory was that Clements saw Cunningham shoot Monroe. The trial court acted correctly in allowing the prosecutor and Cunningham's counsel to attempt to elicit the nonprivileged information. In fact, it turned out that self-incrimination was not Clement's primary concern:

> The Commonwealth: Isn't it true, sir, have you told me and your lawyer as well that the reason you are not testifying is because you are scared of his brother, not because you are afraid of incriminating yourself?

> A: Yes.

Cunningham's counsel specifically requested during cross-examination that Clements be compelled to testify. The Commonwealth had already made the same request. At first the trial court refused, adding that it would consider later Clements' potential tes-

timony *in camera.*

Upon completion of all the evidence the trial court invoked Code § 19.2-270, called Clements as a court witness, and ordered him to testify. Clements stated that Cunningham shot Monroe. Cunningham's counsel then conducted a vigorous and thorough cross-examination of Clements, unfettered by any claim of privilege. Cunningham's assertion that the trial court denied his right to effectively confront and cross-examine Clements is refuted by the record.

Code § 19.2-270 benefits both the witness-in-jeopardy and the accused by immunizing the witness. Benefit to the witness from use of immunity is manifest. The benefit to the accused lies in taking away the obstacle to confrontation posed by the witness' continued assertion of the fifth amendment privilege. A third, and equally important, benefit accrues to the truthfinding process. As the trial judge stated: "The reason behind this statute . . . is obvious. There is a search for justice and we must have the truth." Since the error of which Cunningham complains only results where "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination," *Namet*, 373 U.S. at 187, any such infirmity at Cunningham's trial was cured by his extensive cross-examination pursuant to Code § 19.2-270. After Clements was compelled to testify under the grant of immunity, the "critical weight" came not from Clements' earlier invocation of privilege, but rather from his testimony that he had seen Cunningham shoot Monroe.

Immunization of the witness to protect Cunningham, Clements and the Commonwealth distinguishes the case at bar from all the cases on which Cunningham relies to support his prosecutorial misconduct contention. *Cf. Namet* v. *United States*, 373 U.S. 179 (1963); *United States* v. *Mayes*, 512 F.2d 637 (6th Cir.), *cert. denied*, 422 U.S. 1008 (1975); *United States* v. *Maloney*, 262 F.2d 535 (2d Cir. 1959); *State* v. *Corrales*, 138 Ariz. 583, 676 P.2d 615 (1983); *People* v. *Berg*, 59 N.Y.2d 294, 464 N.Y.S.2d 703, 451 N.E.2d 450 (1983); *People* v. *Malphurs*, 111 App. Div. 2d 266, 489 N.Y.S.2d 102 (1985); *West* v. *State*, 74 Wis.2d 390, 246 N.W.2d 675 (1976). Although no Virginia cases on point can be found, immunization has been held in other jurisdictions to cure any possible prejudice, because the defendant is enabled to cross-examine. *See* Annot., 19 A.L.R. 4th 368, 416-418 (1983).

In sum, Cunningham's confrontation rights and Clements' rights against self-incrimination were adequately protected by the trial court. In addition, Clements' important testimony, which corroborated the victim's eyewitness account, was put before the jury. Cunningham has shown no error.

## II.

Cunningham claims that the trial court unfairly projected itself into the examination of the defense witnesses. A review of the record discloses a number of specific complaints.

Cunningham claims that the trial court prevented him from establishing why the witness, Linda Diane Cunningham, remembered the clothing he was wearing at the time of the crime and in so doing improperly commented upon the evidence.

Linda Cunningham, sister of appellant, testified that her brother came home on April 12, 1984, at about 6:00 p.m. and was wearing a red shirt and bluejeans. On cross-examination she was asked by the Commonwealth's Attorney how she remembered so clearly what he was wearing on April 12, 1984. She replied: "I was there and I remember what he was wearing." Later in the interrogation she stated again that "[t]he only reason I am sure I know what he was wearing on the 12th is because he came in the house and was talking to me." A third time, in response to the same question, she said: "[B]ecause he came in the house to talk to me on April 12 and I remember what he had on." On redirect examination Cunningham's counsel asked some leading questions indicating that there might be something significant about the 12th that would make her remember. The court sustained the objections to those leading questions, and stated that if the question was framed correctly he would permit it. We find nothing in the record to support the contention that the trial court improperly ruled upon the admissibility of the evidence or improperly commented upon the evidence.

Cunningham contends that the court prevented him from cross-examining the victim about the acuity of his vision after he testified that he wore reading glasses and that his identification of Cunningham was made when the assailant was close to him. Monroe testified that he wore reading glasses when he read, but at the time of the incident he was not wearing them. Cunningham's

counsel asked one confusing, awkwardly worded compound question. Upon objection, the trial court properly sustained the objection to the question. Counsel asked no further questions on the subject, and he was not prevented by the trial court from pursuing the matter further had he so desired. There is no merit to this argument.

Appellant cites a series of excerpts from the transcript and argues that the trial court questioned defense witnesses more frequently than witnesses for the Commonwealth. He concludes that this pattern showed bias and prejudice on the part of the trial judge against him.

The conduct of a trial is committed to the sound discretion of the trial court. *Justus* v. *Commonwealth*, 222 Va. 667, 676, 283 S.E.2d 905, 910 (1981), *cert. denied*, 445 U.S. 983 (1982). A trial judge has the right, and sometimes the duty, to question witnesses, but neither opinion on the evidence nor bias may be disclosed. *Goode* v. *Commonwealth*, 217 Va. 863, 865, 234 S.E.2d 239, 240 (1977). To warrant reversal, error must be more than mere impatience; it must prejudice the minds of the jury against the accused or influence them in weighing the evidence. *Moore* v. *Commonwealth*, 186 Va. 453, 463, 42 S.E.2d 871, 876 (1947). In *Parsons* v. *Commonwealth*, 154 Va. 832, 152 S.E. 547 (1930), the appellant claimed that his trial judge interfered with the testimony so frequently as to deny him a fair trial. In *Parsons* the appellant cited a series of transcript excerpts to show bias without actually "laying his finger" on the error. Cunningham's claims suffer from the same infirmity. This court has no duty to deduce bias from the record. 154 Va. at 851, 152 S.E. at 554.

A review of the record does not disclose that the trial judge made any comments upon the testimony of the witnesses. He asked some questions of the witnesses to clarify their testimony and to bring out some evidence not fully developed by counsel. The interrogation was fair to both sides. It was as beneficial to Cunningham as to the Commonwealth. As stated by Cunningham, "this was a hotly contested case." Many objections were made by counsel for both sides which required the trial judge to inquire into the purpose of the evidence and to rule upon the objections. The judge also had to warn the prosecutor to confine himself on redirect to the scope of the cross-examination, not to repeat testi-

mony, and not to echo responses on cross-examination. The court had to warn defense counsel not to incorporate argument into his opening statement, not to echo responses on cross-examination, to keep his inquiries relevant to the case being tried, not to add interpretations to responses of witnesses, not to ask repetitive questions, or questions calling for hearsay responses. The court had to warn counsel for both sides that examination of witnesses was limited to direct, cross and redirect, and to "stop making comments at each other." The trial judge cannot be accused of projecting himself into the case when he is required to deal with problems of this nature.

Cunningham contends that the court improperly engaged in extensive cross-examination of two important defense witnesses, Cathy Carter and William Edward Jones, Jr., and that this was prejudicial; that the court prevented the treating doctor from testifying whether a person shot through the nose and eye would bleed at the points where the bullet entered and exited the nose; that the court acted improperly when, at the conclusion of all the evidence, it recalled Leroy "Weasel" Clements to the stand, *sua ponte*, granted him immunity under Code § 19.2-270, and ordered him to testify; and that the court recalled to the witness stand a defense witness out of the presence of the jury and warned her of perjury, thus indicating the attitude of the court toward Cunningham's case. Cunningham made no objections to the actions of the trial court in any of these instances. He is not entitled to raise these issues for the first time on appeal. Rule 5A:18. Had he directed the trial court's attention to his perceived grievances, the court would have had an opportunity to ensure that the jury was left with no misapprehensions about its conduct. *Dickerson* v. *Commonwealth*, 186 Va. 951, 961-962, 45 S.E.2d 243, 248 (1947).

For these reasons, the judgment of the trial court is affirmed.

*Affirmed.*

Duff, J., concurred.

Benton, J., concurring.

I concur in the decision affirming the conviction; however, I disagree with the conclusion in Part I of the majority opinion that no error was committed in connection with the testimony of the wit-

ness Clements. I believe that there was clear error. Nevertheless, under the circumstances of this case the error was harmless and does not compel reversal.

At the outset I believe that it is important to emphasize the precise issues raised by Cunningham in this appeal. We are not called upon to decide whether Cunningham was deprived of his Fifth or Sixth Amendment rights. Although the question presented is whether Cunningham was denied the right to a fair trial by the conduct of the prosecutor and the trial judge when the prosecutor was permitted to examine Clements after Clements invoked the Fifth Amendment and refused to testify, Cunningham frames his argument to assert error of an evidentiary nature and no specific constitutional violation is raised. *See Namet* v. *United States*, 373 U.S. 179, 185 (1963).

The record demonstrates that the Assistant Commonwealth's Attorney called Clements to testify as a witness during the Commonwealth's case-in-chief with the knowledge that Clements intended to invoke the Fifth Amendment privilege against self-incrimination and with the knowledge that Clements intended improperly to invoke that privilege. Clements responded to a question of the Assistant Commonwealth's Attorney on direct examination as follows:

Q: Isn't it true, Sir, have you told me and your lawyer as well that the reason you are not testifying is because you are scared of his brother, not because you are afraid of incriminating yourself?

A: Yes.

Under the appropriate circumstances the Commonwealth may be justified in putting a person on the stand to testify in order to determine whether, in fact, the witness will refuse to testify by invoking the Fifth Amendment privilege. *See United States* v. *Gernie*, 252 F.2d 664, 669 (2d Cir.), *cert. denied*, 356 U.S. 968 (1958). The Fifth Amendment privilege against self-incrimination is a personal privilege of the testifying witness and not the defendant who is being tried but is not testifying. *Rogers* v. *United States*, 340 U.S. 367, 371 (1951). Based on the record before us,

however, I can discern no justification for the Commonwealth's failure to advise the trial judge prior to calling Clements as a witness that Clements intended to invoke the Fifth Amendment testimonial privilege, and to seek the court's ruling on the issue whether Clements was entitled to assert the privilege under the circumstances presented. Had the trial judge been so advised, he would have had an opportunity to make appropriate inquiry of Clements and his counsel outside the presence of the jury concerning Clements' basis for invoking the privilege. *See State* v. *Armstrong*, 6 Ariz. App. 139, 430 P.2d 718 (1967).

Instead, the Commonwealth called Clements to testify, knowing that he would assert the Fifth Amendment privilege, and requested the opportunity to cross-examine him as a hostile witness. The trial judge refused the request and the Commonwealth over Cunningham's objection proceeded to place its theory of the case before the jury:

Q: Were you out on Baker Street School playground on April 12, 1984?

A: I plead the Fifth Amendment.

Q: Did you shoot Horace Monroe?

A: I don't understand. I plead the Fifth.

Q: Isn't it true, sir, that you, in fact, saw the shooting of Horace Monroe?

A: I plead the Fifth. I would rather not talk.

* * *

Q: Isn't it true, sir, have you told me and your lawyer as well that the reason you are not testifying is because you are scared of his brother, not because you are afraid of incriminating yourself?

A: Yes.

* * *

Q: Did you and James Rome and this man, were you all involved in that shooting?

A: I plead the Fifth.

* * *

Q: Isn't it true that you and James Rome and this man were all together, and he said he was going to go over and rob the little old man coming over the bridge; isn't that true?

MR. KAESTNER: Objection. Leading.

THE COURT: Well, just leave it that way. Is that true?

THE WITNESS: I plead the Fifth.

Q: Isn't it true that after this man shot him all three of you ran?

MR. KAESTNER: Objection. Leading.

Q: Is that true?

THE COURT: Well, don't say that. You can ask him did you run with the other two people. I think that calls for a yes or no answer.

Q: Didn't you and James Rome run off after this man was shot?

A: I plead the Fifth.

The trial judge then refused the Commonwealth's request at the conclusion of the direct examination of Clements to compel Clements to testify. The Commonwealth made the request because "[h]e is invoking his Fifth Amendment privilege not because he shot him but because he is afraid." During cross-examination, defense counsel's request to the court to compel Clements to testify was joined by the Commonwealth and similarly was refused by the trial court.

I believe that the trial court erred in allowing the Commonwealth to continue to question Clements for the purpose of suggesting the prosecutor's theory of the case to the jury after Clements had invoked the privilege. *See Saunders* v. *United States*, 373 F.2d 735 (9th Cir. 1967); *State* v. *Dinsio*, 176 Ohio St. 460, 200 N.E.2d 467 (1964). Clements' assertion of the privilege might have led the jury to draw an improper inference of Cunningham's guilt because Clements, who was involved with Cunningham that day, was refusing to testify. *See United States* v. *Coppola*, 479 F.2d 1153, 1160 (10th Cir. 1973).

When Clements repeatedly invoked the Fifth Amendment privilege and, certainly, at the time Clements gave his reason for invoking the privilege, the trial court erred in not making inquiry, out of the presence of the jury and before allowing further questioning, in order to determine whether to compel Clements to testify or whether to take other measures. *See People* v. *Poma*, 96 Mich. App. 726, 294 N.W.2d 221 (1980).

At the conclusion of the cross-examination of Clements, the trial judge indicated that he would consider Clements' claim of privilege at a later time *in camera*. It was only after the Commonwealth and the defense had presented evidence and prior to the submission of the case to the jury that the trial judge called Clements to the stand and granted him immunity on the basis of Code § 19.2-270. The record does not reflect that the Commonwealth made a request for immunity. Nevertheless, as stated in the majority opinion, the Commonwealth without objection con-ducted further direct examination of Clements and the defense conducted a thorough cross-examination.

I would affirm the conviction despite what I perceive to be errors in the presentation of Clements' testimony because under the circumstances of this case any impermissible inferences that the jury may have drawn from Clements' repeated assertion of the privilege during his initial examination also could have been drawn from Clements' testimony following the grant of immunity. Moreover, the error as cured did not lend "critical weight" to the Commonwealth's case. *See State* v. *Black*, 291 N.W.2d 208, 213 (Minn. 1980); *Burkley* v. *United States*, 373 A.2d 878, 880 (D.C. 1977).