**UNITED STATES of America ex rel. Roy SCHUSTER, Petitioner-Appellant,**

v.

**Leon J. VINCENT, Warden, Green Haven Correctional Facility, Respondent-Appellee.**

**No. 79, Docket 75–2058.**

United States Court of Appeals, Second Circuit.

Argued Sept. 5, 1975.

Decided Sept. 23, 1975.

**154**

Before KAUFMAN, Chief Judge, and MULLIGAN and GURFEIN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Although we are reasonably certain that the shocking story revealed in The Gulag Archipelago[1] could not take place in this country, the facts of Roy Schuster's case are reminiscent of Solzhenitsyn's treatise. In our opinion in *United States ex rel. Schuster v. Herold,* 410 F.2d 1071 (2d Cir.), *cert. denied,* 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969), we described the appalling sequence of events in which Schuster—convicted of second degree murder and sentenced in 1931 to a term of 25 years to life—was transferred in 1941 from Clinton State Prison to Dannemora State Hospital for the Criminally Insane in apparent retaliation for his efforts to expose prison cor-

ruption. This Court held that the procedures by which Schuster was involuntarily committed to the mental institution were constitutionally defective, 410 F.2d at 1081, and issued a mandate in 1969 envisioning Schuster's return to a normal prison (if Schuster were found sane) and release on parole (if found meritorious) within a matter of weeks. 410 F.2d at 1089; *see also id.* at 1077.

But the transfer from Dannemora to a prison for sane inmates was to be delayed three years more, and even then was orchestrated in a manner that thwarted Schuster's 31-year effort to compel the State publicly to acknowledge his sanity and its own prior grave errors. Moreover, Schuster—always a model prisoner[2]—was never paroled. Now 70 years old and languishing at Green Haven Correctional Facility, he remains incarcerated 44 years after conviction of a crime for which the average time of imprisonment before parole is 15 years.[3]

In 1969, Schuster would have accepted[4] the supervised release entailed in parole.[5] The State's behavior since 1969, however, has convinced him "that the [P]arole [B]oard is not morally fit to supervise anyone, certainly not me."[6] In his current petition for a writ of habeas corpus, 28 U.S.C. § 2254, Schuster demands his unrestricted freedom and claims that it is 22 years overdue.[7]

The State concedes that Schuster's is a "sad case" and claims that "the Parole Board wants this man out."[8] But it in-

---

1. A. Solzhenitsyn, The Gulag Archipelago (1973).

2. 410 F.2d at 1074. The State does not contend that Schuster's behavior has deteriorated since 1969. Indeed, the Parole Board is anxious to release Schuster on a parole agreement freeing him from most of the ordinary conditions of parole. *See* II, *infra.*

3. J. Stanton, *Murderers on Parole,* in Readings in Criminology and Penology 696–97 (D. Dressler, ed. 1972).

4. *See* discussion in II, *infra.*

5. N.Y. Correction Law § 210 (McKinney 1975) provides in part: "The division of parole shall

also be charged with the duty of supervising all prisoners released on parole . . . ."

6. Minutes of May 16, 1972 Parole Board Hearing, IIS–440467, GH.CF. 17722 at 1.

7. As noted in our 1969 opinion, 410 F.2d at 1074, Schuster was first eligible for parole consideration in 1948. The earliest possible date for absolute discharge from parole would have been five years after initial release on parole. N.Y. Correction Law § 212(8) (McKinney 1975).

8. This statement was made during the course of oral argument.

sists that the petitioner is not entitled to the immediate unconditional release he requests. Under New York law, an individual convicted of second degree murder is ineligible for absolute discharge until he has completed five years of unrevoked parole. N.Y. Correction Law § 212(8) (McKinney 1975).[9] Moreover, the statute provides that "[n]o person shall be . . . paroled unless he has agreed in writing to the conditions of such . . . parole," N.Y. Correction Law § 827(5) (McKinney 1975)—and Schuster has adamantly refused the parole agreements which the State belatedly began proffering in 1972. To place the current impasse—and our resolution of it—in perspective, a recapitulation of the underlying facts is necessary.

## I.

In the 1920's, Roy Schuster was a young dancer of some renown, commanding the then-extraordinary sum of $200 a week for his performances. During the Depression, however, his income shriveled to $11 a week. When his marriage also disintegrated, Schuster became distraught and attempted suicide. Settlement discussions with his wife proved acrimonious; Mrs. Schuster demanded $40 a week alimony regardless of how little Schuster earned. After Mrs. Schuster warned she would have Schuster jailed for contempt of court if he did not pay, Schuster again threatened to kill himself. Finally, during an unproductive meeting with Mrs. Schuster and her lawyer, the petitioner reiterated his suicide vow, drew a revolver from his pocket, and—in the ensuing chaos—fired several shots, fatally wounding his wife and injuring her attorney.

Schuster was convicted of second degree murder after a one-week trial. During the trial Schuster claimed that he was in a state of panic during the melee and was not aware of what was happening. To rebut this defense, the State's psychiatric expert repeatedly denied that Schuster was suffering from any form of delusion or mental disease. On November 2, 1931, at the age of 27, Schuster was sentenced to a term of from twenty-five years to life.

Schuster was a model prisoner who taught a "cell-study" course leading to a high school equivalency degree and received a letter from the New York State Board of Education commending his efforts. In the normal course of events, Schuster would have been eligible for parole consideration in 1948 and for unconditional discharge five years thereafter. But in 1941, Schuster became convinced of corruption in Clinton State Prison, and when he complained of this condition the State responded by transferring him to Dannemora State Hospital for the Criminally Insane without the formalities of a commitment hearing. The translocation accorded with the provisions of § 383 of the N.Y. Correction Law, McKinney's Consol.Laws, c. 43, as it then read, and the New York State courts dismissed a succession of petitions for habeas corpus in which Schuster challenged his commitment to Dannemora.

Schuster had been allowed to languish at Dannemora for almost 30 years when he finally sought relief in the federal courts. On April 24, 1969 this Court held that the State's failure to afford Schuster a sanity hearing with substantially all of the safeguards and procedures granted to those involuntarily committed as patients in civil mental hospitals constituted a violation of Schuster's rights under the Equal Protection Clause of the Fourteenth Amend-

---

**9.** If the board of parole is satisfied that an absolute discharge from parole or from conditional release is in the best interest of society, the board may grant such a discharge prior to expiration of the full maximum term to any parolee under an indeterminate sentence for a felony . . . who has been on unrevoked parole for at least five consecutive years.

. . .

A discharge granted under this section shall constitute a termination of the sentence with respect to which it was granted.

ment. 410 F.2d at 1081. Accordingly, we ordered the federal district court

> to hear and determine petitioner's application unless a hearing is held by the courts of the state determining under the standards set forth herein the issues Schuster raises within 60 days from the date of issuance of the mandate herein, or such further time as the District Court may for good cause allow.

410 F.2d at 1089. The State sought Supreme Court review of our decision, but certiorari was denied. 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969).

## II.

Although this Court's mandate issued on May 26, 1969, the State sanity hearing ordered to be held within 60 days has never taken place. The hearing initially was delayed—for 3 years—because the State insisted on contesting Schuster's choice of venue.[10] Although this venue question was never directly presented to this Court, we did take the occasion on a related matter to express our

> wonder why the State could not have waived this venue issue in view of the special circumstances here.

*United States ex rel. Schuster v. Herold,* 440 F.2d 1334 (2d Cir. 1971). Perhaps our surprise was unwarranted, for the action before us in 1971 itself provided further graphic illustration of the State's continuing procrastination in proceeding to correct Schuster's status and its callousness to Schuster's charges that he remained the subject of harassment and discrimination. That proceeding, a civil rights action brought under 28 U.S.C. § 1343(3), commenced in 1968 after Dannemora's then-director, Dr. Herold, refused to permit Schuster to apply $40, of the $75 in spendable assets he had managed to accumulate, to purchase legal materials. Judge Port dismissed Schuster's petition following receipt of a letter in which Dr. Herold averred that Dannemora had an "extensive law library." The truth of the matter was that Danne-

mora's "extensive" legal collection comprised six works, two of which could not be removed from the Supervisor's office. 440 F.2d at 1335. Before we could hear Schuster's appeal, Dr. Herold was replaced by a new director who "apparently realiz[ed] the absurdity of [Dr. Herold's] position," *id.,* and granted Schuster's request. Since "we [could] not properly impute Dr. Herold's bad faith to [the new director]," *id.,* we dismissed Schuster's appeal as moot.

This episode unfortunately did not signal the end of the State's obdurate treatment of Schuster. After many others had already received *Schuster*-type hearings as mandated by our 1969 decision, Schuster's *own* sanity hearing was finally scheduled for April 6, 1972. This date, of course, was almost 3 years after our order which had required a hearing within 60 days, and 31 years after Schuster's transfer to Dannemora. But the State still could not bring itself to allow Schuster the satisfaction he had sought for a quarter-century—a declaration after a hearing that he had been sane and improperly transferred. A few days before the hearing date, according to Schuster's unchallenged testimony,

> [T]hey called me up and said, 'We are thinking about sending you back to prison, what prison would you like to go to?' I told him, 'I have a hearing coming up, I would not want to be transferred until I have had the hearing with a jury trial,' which I was entitled to there, and he said, 'in that case I'll have to take out a retention action against you.' I said, 'Go ahead, I have no objection'. He said, 'You have no objection?' I said, 'No, none whatsoever'. Then he thought a while and then he said, 'No, I am determined to transfer you'.

Transcript of July 28, 1972 Hearing at 37–38, *People ex rel. Schuster v. Vincent,* 73 Misc.2d 653, 342 N.Y.S.2d 18 (Sup.Ct.1972), *rev'd,* 42 A.D.2d 596, 344 N.Y.S.2d 735 (1973), *leave to appeal denied,* 33 N.Y.2d 1009, 353 N.Y.S.2d 969,

10. *See United States ex rel. Schuster v. Herold,* 440 F.2d 1334 (2d Cir. 1971).

309 N.E.2d 430 (1974). And Schuster was summarily transferred from Dannemora to Green Haven Correctional Facility (not a mental institution) on March 29, 1972. Schuster's distress at being denied the public hearing to vindicate his claims of sanity and improper state conduct prompted a motion to enforce our 1969 order mandating a hearing. The release from Dannemora, however, had mooted the hearing, and Schuster's request was therefore denied. Order, Docket No. 32194 (2d Cir., filed June 15, 1972).

This accumulation of 31 years of mistreatment and frustration understandably left its mark of bitterness on Schuster. This became painfully apparent at the parole hearing held on May 16, 1972. Since the Parole Board's practice had been to deny parole to anyone incarcerated in a mental institution because such a person was conclusively presumed to be mentally ill, 410 F.2d at 1076 n. 3, the 1972 hearing was Schuster's first effective opportunity for parole. Nonetheless, Schuster opened the hearing by stating that his conscience prevented him from accepting any Parole Board supervision, because the Board had

> cooperated with the corruptively motivated retention of me 24 years beyond the date of merit . . . [and because] the [P]arole [B]oard is not morally fit to supervise anyone, certainly not me.

Minutes of May 16, 1972 Parole Board Hearing, IIS–440467, GH.CF.–17722. Although the petitioner had initially taken a similar stance when he applied to this Court for relief in 1968, Petition (pro se, April 24, 1968) at 1, 12, 17, *United States ex rel. Schuster v. Herold, supra,* he had moderated his request shortly thereafter, seeking only his return "to the custody of Clinton State Prison, where he may again be considered for parole." Appellant's Brief at 17, *id.*

Instead of seeking conciliation or pointing out (as the State now acknowledges) that Parole Board "supervision" could be purely constructive, with "the conditions normally involved in a parol-

ee's release . . . be[ing] stretched or varied to the point where they are barely noticeable," Appellee's Brief at 16, the Parole Board chose a different tack. The description by New York State Supreme Court Justice Hawkins, who considered Schuster's subsequent habeas corpus petition seeking unconditional release, *People ex rel. Schuster v. Vincent, supra,* is in point. The Board, he said, "initiated a Socratic dialogue" inducing Schuster to "re-enter the maze from which he would be unable to extricate himself." *Id.,* 73 Misc.2d at 655, 342 N.Y.S.2d at 20. The aptness of Justice Hawkins' characterization is evidenced by the following excerpts from the parole hearing transcript:

Q. . . . [W]e are in a position to talk to you about possible parole, but by your own statement, you are not interested.

A. I would not accept parole. Absolutely not. I am 25 years over my parole time. I would regard even an offer of parole, as a gratuitous insult.

. . . . .

Q. . . . [B]y reason of your own statement, and apparently your own attitude, you do not want parole. Is that correct?

A. That's correct.

. . . . .

Q. . . . Now, are you steadfast—as you have heard me say to you what we can and can't do, are you steadfast that this is the way you want it? That you do not want to be considered for parole?

A. That's right. Now if you'll excuse me, I'll go.

Q. All right. We'll make this a matter of the record.

Minutes of May 16, 1972 Parole Board Hearing, *supra.*

Justice Hawkins did not order Schuster's absolute discharge, but did direct the Parole Board promptly to conduct another hearing and to "give due weight to the existing unusual and extraordinary facts which, in my opinion, appear to

compel unencumbered parole." 73 Misc.2d at 655, 342 N.Y.S.2d at 21. Even this was too much for the State to accept, however, for it appealed, in an act of Tartufian self-righteousness, and obtained a reversal of the order Judge Hawkins had entered. The Appellate Division's short decision held that

> As long as the Parole Board violates no positive statutory requirement, its discretion is absolute and beyond review in the courts . . . .

42 A.D.2d at 597, 344 N.Y.S.2d at 737. The New York Court of Appeals denied leave to appeal, *supra,* and Schuster—having thus exhausted available State remedies, as required by 28 U.S.C. § 2254—turned once again to the federal courts.

When the matter came before District Judge Owen, from whose decision Schuster here appeals, the judge

> was moved, as was the Second Circuit, and held a hearing on November 22, 1974 at which the petitioner and a representative of the Parole Board were present. At the urging of the Court, the representative of the Parole Board went so far as to consent to a Special 'release agreement' which would relieve petitioner from most of the ordinary conditions of parole. The obligation to make periodic reports were [sic] waived, the [P]arole [B]oard was not to interfere with petitioner's life, and petitioner was not to be returned to prison unless he should commit another crime. Petitioner rejected this, continuing to demand nothing less than unconditional discharge.

Memorandum and Order, 74 Civ. 1705 at 5 (S.D.N.Y. March 27, 1975). Judge Owen felt he did not have the power to order Schuster's release, and therefore reluctantly dismissed Schuster's habeas petition.[11] On April 7, 1975, the district judge granted a certificate of probable cause.

## III.

We can no longer sit by and permit the State to continue toying with Roy Schuster's freedom. Not only has the State repeatedly flouted the spirit of this Court's 1969 mandate (as we shall discuss below), but its treatment of Schuster during his entire confinement has been marked by both a complete disregard for the rights guaranteed him by the Constitution and a total callousness to the ordinary decency due every human. The inference is virtually inescapable that Schuster's entire 31-year confinement in the hospital for the criminally insane was improper. By precipitously transferring him from Dannemora in 1972, the State in effect belatedly joined the "general agreement" which existed as early as 1967, 410 F.2d at 1076, 1088, that Schuster was not in need of custodial detention in a mental institution. Moreover, the State does not contend that Schuster made a rapid recovery immediately prior to 1972 or 1967—or, indeed, that his condition changed at all during his three decades at Dannemora. Since Schuster received no treatment, 410 F.2d at 1076, "improvement" would be highly unlikely—especially in view of the undisputed tendency of prolonged confinement in a mental hospital to exacerbate rather than alleviate any pre-existing condition. *See* Wexler, *The Administration of Psychiatric Justice,* 13 Ariz.L.Rev. 1, 118 (1971); Rosenhan, *On Being Sane in Insane Places,* 179 Science 250, 254–57 (1973); Bhaskaran & Dhawan, *A Comparison of the Effects of Hospitalisation on Long-Stay and Recently Admitted Female Schizophrenic Patients,* 20 Int'l J.Soc.Psychiat. 72 (1974).

Commitment to a mental institution of one who—like Schuster—posed no danger to himself or others, received no treatment, and was not incapable of safely surviving outside of a mental hospital—was recently held unconstitutional

---

11. It is difficult for us to understand why, after Schuster's rigid position on parole became well known to the State, it did not seek to secure a pardon and end this maze from which the parties could not extricate themselves. Indeed, Judge Owen so suggested. Memorandum and Order, 74 Civ. 1705, at 5 (S.D.N.Y. March 27, 1975).

by the Supreme Court. *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). We do not suggest that the *O'Connor* decision retroactively invalidated Schuster's confinement. Nevertheless, we cannot, in deciding the present appeal, remain wholly oblivious to the fact that Schuster was needlessly confined in an insane asylum for almost half of a lifetime, and that such detention is today considered so shocking—and indefensible—that it is constitutionally impermissible.

The cruelty inflicted on Schuster by his commitment to Dannemora State Hospital for the Criminally Insane was compounded by other hardships and deprivations visited upon him as a result of that act. By transferring Schuster to Dannemora, the State not only subjected him to the adversities and rigors of a mental hospital but also made him effectively ineligible for parole. While our 1969 opinion did not consider the constitutionality of this policy barring parole consideration for convicts incarcerated in mental institutions, a state court subsequently held it a violation of the Equal Protection Clause of the Fourteenth Amendment, *People ex rel. Slofsky v. Agnew,* 68 Misc.2d 128, 326 N.Y.S.2d 477 (1971), and the State finally abandoned the policy.[12]

Nor can we conclude our accounting of the State's derelictions without recalling

12. *According to Parole Commissioner Quinn,*
   [T]he fact is, that the [P]arole [B]oard could not, . . . even as recently as 1971, under a firm policy that had been adopted, parole anybody from Dannemora State Hospital.
   *Minutes of May 16, 1972 Parole Board Hearing, supra,* at 2. Since the State did not appeal *Slofsky,* it would appear that the holding therein persuaded the Parole Board to abandon its former policy.

13. As we noted in our earlier opinion,
   Confined with those who are insane, told repeatedly that he too is insane and indeed treated as insane, it does not take much for a man to question his own sanity and in the end to succumb to some mental aberration.
   410 F.2d at 1078. *See also* 410 F.2d at 1079–80, n. 7.

14. There is no doubt that this is the only reason for Schuster's continued imprisonment.

that it is the State which is responsible for the present cul-de-sac. Not satisfied with the severe psychological pressures it had already imposed on Schuster during his three decades at Dannemora,[13] the State has continued to employ every conceivable artifice and device to exacerbate the petitioner's understandable frustration and bitterness—and indeed to induce him to reject parole and its concomitant of five more years under state supervision. Although the State—after repeated prodding by Justice Hawkins, Judge Owen, and this Court—has recently exhibited a slight, reluctant moderation of its attitude, this change has proved insufficient to heal the emotional scars 34 years in the making. The State demands Schuster's signature on a parole agreement which contains no substantive parole conditions, and which the State has driven Schuster to regard as morally repugnant. In the extraordinary circumstances of this case, Schuster's continued imprisonment for failure to sign the parole agreement[14] approaches the threshold, if it does not indeed cross it, of cruel and unusual punishment in violation of the Eighth Amendment.

## IV.

Chief Justice Warren observed in *Trop v. Dulles,* 356 U.S. 86, 99–101, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958),[15]

> The record discloses that at the parole hearing on May 16, 1972, the Parole Board was willing to parole relator and the Attorney-General implicitly consented thereto; and that Schuster has been a fit person for parole. But relator, in his intransigence . . ., insisted that only unconditional release was acceptable to him. . . . This position of relator, in our opinion, prevented the Parole Board from granting him such parole as might lawfully have been allowed him
> . . . . .

*People ex rel. Schuster v. Vincent,* 42 A.D.2d at 597, 344 N.Y.S.2d at 736. *See also* Judge Owen's opinion, *supra,* at 5.

15. Although the Chief Justice was speaking only for a plurality (with Justices Black, Douglas and Whittaker), a majority of the Justices referred approvingly to these words in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *See id.* at 242, 92 S.Ct.

The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. . . . The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. . . . [T]he words of the Amendment are not precise and . . . their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

Clearly the treatment to which Roy Schuster has been subjected over these many years, and in his present continued confinement, violates the most elementary standards of decency. Psychological oppression is as much to be condemned as physical abuse, and this Court has previously determined that acts causing mental suffering can—even absent attendant bodily pain—violate the Eighth Amendment. *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir. 1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973) ("We cannot approve of threatening an inmate's sanity and severing his contacts with reality by placing him in a dark cell almost continuously day and night."); *Wright v. McMann,* 387 F.2d 519, 526 (2d Cir. 1967). Moreover, many courts "have recognized that a proscription against cruel and unusual punishment can be violated by the cumulative effect of several . . . conditions which, considered independently, might or might not approach the requisite severity." Annot., *Prison Conditions as Amounting to Cruel and Unusual Punishment,* 51 A.L.R.3d 111, 207 (1973); *see, e. g., Holt v. Sarver,* 309 F.Supp. 362, 373 (E.D.Ark.1970), *aff'd,* 442 F.2d 304 (8th Cir. 1971).

■ Nor need there be a conscious purpose to inflict suffering, for acts causing severe harm to violate the Eighth Amendment. *Roberts v. Williams,* 456 F.2d 819, 827–28 (5th Cir.), *cert. denied,* 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971) ("callous indifference" sufficient); *United States ex rel. Miller v. Twomey,* 479 F.2d 701, 719–20 (7th Cir. 1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974) (dictum). Although we need not consider the State's intent, we note that its claims of inability to parole Schuster are unpersuasive. We have been told:

It is true that many states require the parolee to read and sign the parole agreement embodying the conditions of release. . . . Failure to sign may indicate that the convict, on release, will not obey the conditions, but it is impossible to say that the state would be powerless to release him if it so wished.

Note, *Parole: A Critique of its Legal Foundations and Conditions,* 38 N.Y.U.L. Rev. 702, 709 (1963).

V.

■ Although we do not decide whether the State's treatment of Schuster violated the Eighth Amendment, we find this question and its discussion above relevant to our actual holding in this case. We are convinced that Schuster's continued detention must be terminated because the State has egregiously violated the spirit of our 1969 mandate. Equity regards as done what ought to have been done, 2 Pomeroy, Equity Jurisprudence § 363 (5th ed. 1941) and cases there cited; and resolves uncertainties against those whose wrongful acts or omissions created them, *see Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946). And the fact that the State's behavior clearly approaches that forbidden by the Eighth Amendment compels our application of these well-known maxims.

2726 (Douglas, *J.*), 269–70, 92 S.Ct. 2726 (Brennan, *J.*), 327, 92 S.Ct. 2726 (Marshall, *J.*),

409, 92 S.Ct. 2726 (Blackmun, *J.*), 306, 92 S.Ct. 2726 n. 1 (Stewart, *J.*).

As previously mentioned, we ordered the State in 1969 to hold a sanity hearing for Schuster within 60 days—but the State refused for 3 years even to schedule a hearing, and finally transferred Schuster summarily, and without a hearing. This three-year delay would be unreasonable in any setting. But, set in the context of Schuster's long and oppressive confinement, it is wholly unjustifiable. Our 1969 decision put the State on notice that Schuster had been grievously wronged, and required it to act with dispatch to correct these wrongs. A delay that might otherwise be tolerable thus became tantamount to an intentional violation of Schuster's rights.

The harm which accompanied this and the State's other inexcusable breaches of good faith and elementary decency is not limited to the further unconstitutional suffering endured by Schuster for three additional years at Dannemora. Had the transfer to Green Haven been effected in 1969, as it should have been,[16] Schuster's parole hearing would have been held shortly thereafter—and we can only conclude that in 1969 the Parole Board would have offered him parole, and

Schuster would have accepted. We have already indicated that the State proposed to parole Schuster almost immediately after his 1972 relocation, and no claim is made that Schuster—a model prisoner who was automatically denied parole consideration during his tenure at Dannemora—was any less deserving of parole in 1969 than in 1972. It is inconceivable that Schuster would have rejected parole in 1969, since parole was the very relief he then sought.[17]

The State's flagrant violation of the spirit[18] of our mandate, considered in the light of its prior unconstitutional acts, requires us to consider Schuster as constructively paroled in 1969. Further, since Schuster's prison behavior has satisfied conditions far more strenuous than any the State could or would[19] have imposed in 1969, we must deem Schuster to have completed 5 years of unrevoked parole in 1974. Accordingly, the Parole Board has lost jurisdiction over Roy Schuster,[20] and he is to be discharged from the State's custody forthwith. See *People ex rel. Tune v. Rubin,* 81 Misc.2d 254, 364 N.Y.S.2d 86, 90 (1974), aff'd, 47 A.D.2d 814, 367 N.Y.S.2d 959 (1975).[21]

---

**16.** The State does not argue that Schuster's condition changed between 1969 (when our mandate issued) and 1972—or, for that matter, between 1967 and 1972. The tacit admissions which may be inferred from Schuster's sudden 1972 transfer from Dannemora are that his confinement in that institution was improper and that this impropriety should relate back at least to 1969.

**17.** See II, *supra.*

**18.** The State did obtain an order from Judge Port extending the time during which the hearing could be held until "60 days after the Courts of New York finally determine the matter now pending on appeal [apparently referring to the venue litigation]." Order of September 25, 1969, *United States ex rel. Schuster v. Herold,* 65 CV 408 (N.D.N.Y.). In granting this request, Judge Port abused his discretion, in light of the past history of the case and our clear directive that Schuster be given the hearing within a reasonable period after our mandate. Moreover, the State's failure to transfer Schuster out of the insane asylum during the three-year interval between 1969 and 1972 was unconscionable in view of the consensus expressed in 1967 that Schuster was not in need of custodial detention in a mental institution,

410 F.2d at 1076, 1088, and the strong indication given in *Schuster I* that his entire period of confinement at Dannemora had been improper.

**19.** There was no reason in 1969 for the Parole Board to impose conditions any more extensive than the minimal ones offered to Schuster in the November 22, 1974 hearing before Judge Owen, *supra.*

**20.** N.Y. Correction Law § 212(8), *supra,* does not provide an automatic right to absolute discharge after 5 years of unrevoked parole. The State, however, promised Schuster such a discharge if he committed no crimes during 5 years of parole. See Judge Owen's opinion, *supra,* at 5.

**21.** We are well aware of the traditional disinclination of the federal judiciary to review parole board decisions (the "hands-off" doctrine), *Menechino v. Oswald,* 430 F.2d 403, 412 (2d Cir. 1970), cert. denied, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635 (1971); and cases discussed in Note, *Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts,* 72 Yale L.J. 506 (1963); Newman, *Court Intervention in the Parole Process,* 36 Albany L.Rev. 257, 259 (1972); Comment, *Curbing Abuse in the Decision to*

The judgment of the district court is reversed, the petition for a writ of habeas corpus is granted, and the State is ordered to provide Schuster his absolute discharge. The mandate will issue forthwith.

*Grant or Deny Parole,* 8 Harvard Civ.Rts.—Civ.Lib.L.Rev. 419, 434–35 (1973), or, indeed to interfere with the operation of any state agency. *See, e. g., Sostre v. McGinnis,* 442 F.2d 178, 191 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). The courts, however, have overcome their hesitation when constitutional rights have been involved, *see* cases cited in Newman, *supra,* at 274–98.

Our conclusion that Schuster was constructively paroled in 1969 and absolutely discharged in 1974 is based entirely upon facts conceded—explicitly or implicitly—by the State. *See* II, V, *supra.* Thus, our holding is limited to the facts presented here and we are not substituting our judgment or our appraisal of the facts for that of the Parole Board on matters properly left to its discretion.