**Richmond**

GARY A. GOSLING

v.

COMMONWEALTH OF VIRGINIA

No. 1700-90-2

Decided March 24, 1992

160

COUNSEL

Donald C. Blessing, for appellant.

H. Elizabeth Shaffer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**BRAY, J.**—Gary A. Gosling (defendant) appeals a felony conviction of possession of marijuana while an inmate in a Virginia correctional facility. He contends that the trial court erred in (i) refusing to compel the testimony of a witness, (ii) denying him an opportunity to proffer for the record the anticipated testimony of the witness, and (iii) admitting into evidence several packages of the alleged drug and the related certificate of analysis. We disagree and affirm the conviction.

The evidence disclosed that defendant was an inmate at the Buckingham Correctional Center (Buckingham) on January 31, 1990, the date of the offense. Sergeant D. W. Staton (Staton), then an "Institutional Investigator" with the Virginia Department of Corrections, had received information from a "confidential source" of unlawful activity within Buckingham and reported it to Captain Charlie T. Barksdale (Barksdale), a corrections officer at the institution. An investigation ensued and Barksdale ordered that several named inmates, including defendant, be "escorted" to the "Watch Office" by Sergeants Holman and Isaac (Isaac), also corrections officers.

As defendant was accompanied to the office, Isaac observed him reach "into his right hip pocket," remove "a pack of cigarettes" and "another small piece of plastic or cellophane," which he "put . . . in his mouth." Defendant repeated these movements "several times" and his actions were reported to Barksdale on arrival at the office. When Barksdale instructed defendant to "open his mouth," defendant refused and "started towards the exit," but was "stopped . . . and wrestled to the floor." During the struggle, a small plastic "bag fell out of [defendant's] mouth" and he "spit out three more bags." These bags were recovered by Barksdale and he noticed that they contained what "looked like tobacco or grass type substance like marijuana."

Following the "altercation," corrections officer Charles E. Johnston (Johnston) assisted in a "strip search" of defendant and discovered "a little packet of what appeared to be marijuana in [defendant's] right front pocket."

Barksdale and Johnston placed the items which they recovered into separate envelopes, four packets in the Barksdale envelope and a single packet in the Johnston envelope. Barksdale and Johnston made identifying notations on their respective envelopes and delivered them to Staton. Staton testified that, without opening the envelopes or knowledge of their contents, he retained them in "the evidence locker" until "the incident reports" and "everything" was "together," and then forwarded them "to the lab for testing." He further testified that this evidence, including the original two envelopes, was subsequently returned to him from "the lab," accompanied by a "certificate of analysis," all bearing the same "lab number."

Although these items were thereafter retained by Staton in a secure area and identified by him at trial, one envelope, without explanation, had been "opened on the back." This envelope contained a single item and, upon defendant's objection, was not received into evidence. Four packets were found in the second envelope, three of which were marked "1-B," "1-C" and "2," respectively, and the fourth, unmarked. Barksdale identified both this envelope and "the four packs [of] material" as those items he originally delivered to Staton, as well as a photograph of the four packages, also received into evidence.

Defendant noted that the certificate of analysis referenced five items, marked "1A-1C," "1-D" and "2" and received by the laboratory in two envelopes. He argued that the Commonwealth was unable to sufficiently correlate the items analyzed and identified by the laboratory with the contraband and envelopes offered into evidence, and objected to both the items and the report. In response, the trial court admitted the four remaining packets but carefully admonished the jury that the unmarked packet was introduced only for the "purpose of showing there were four packages in that envelope," and was not to be "considered as evidence."

Jimmy Hamrick (Hamrick), an inmate at Buckingham at the time of the subject offense, testified in behalf of defendant that another inmate had given "what looked like . . . a pack of cigarettes" to defendant just prior to his apprehension, telling defendant to "give that to Joe." However, when defendant's counsel asked Hamrick if he was aware "what the contents of the package was," Hamrick exercised his Fifth Amendment privilege against self-incrimination (the privilege)[1] and refused to answer.

Defendant requested the trial court to advise Hamrick of that protection provided to witnesses by Code § 19.2-270,[2] recited several additional questions he "would like to ask," and moved the court to "compel [Hamrick] to testify" or be "in contempt." The trial judge determined that Hamrick had "raised" and was

---

[1]  U.S. Const. amend. V.

[2]  Code § 19.2-270 provides that: "In a criminal prosecution, other than for perjury, or in an action on a penal statute, evidence shall not be given against the accused of any statement made by him as a witness upon a legal examination, in a criminal or civil action, unless such statement was made when examined as a witness in his own behalf."

"claiming" his privilege, declined to "instruct him on what the law is," and overruled defendant's motion.

Defense counsel then represented to the court that he had previously spoken with Hamrick and wished to "proffer what his testimony might be . . . if he were compelled to testify." The Commonwealth objected and the proposed proffer was refused by the trial judge.

█ Hamrick shares with every American citizen the privilege against compulsory self-incrimination. Although the federal guarantee, with its accompanying standards, is impressed upon the states through the Fourteenth Amendment of the United States Constitution, *In re Gault*, 387 U.S. 1, 42 (1967); *Malloy v. Hogan*, 378 U.S. 1, 29 (1964), the Virginia Constitution also expressly assures this privilege to an accused, as well as the right to confront the witnesses against him, the power of compulsory process for obtaining witnesses and the corresponding duty of such witnesses to testify. Va. Const. art. I, § 8; *Farmer v. Commonwealth*, 12 Va. App. 337, 340, 404 S.E.2d 371, 372 (1991).

█ Code § 19.2-270, and similar state and federal immunity statutes, represent legislative efforts to "seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify." *Kastigar v. United States*, 406 U.S. 441, 446 (1972). These statutes recognize that "many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime" and, thus, are "essential" to the effective prosecution of criminal activity and the "truthfinding process." *Id.* at 446-47; *see Cunningham v. Commonwealth*, 2 Va. App. 358, 362-63, 344 S.E.2d 389, 391-92 (1986); *Cullen v. Commonwealth*, 65 Va. (24 Gratt.) 624, 633-34 (1873).

█ It is well established in Virginia, however, that the privilege may not be diminished or compromised by an immunity statute that affords less than "full immunity and assurance against any liability to prosecution for a disclosure" compelled from a witness. *Flanary v. Commonwealth*, 113 Va. 775, 780-81, 75 S.E. 289, 290 (1912); *Kendrick v. Commonwealth*, 78 Va. 490, 496 (1884); *Temple v. Commonwealth*, 75 Va. 892, 898-900 (1881); *Cullen*, 65 Va. (24 Gratt.) at 635. Testimony may be compelled only "where immunity is complete and there is no possibility of prose-

cution." Charles E. Friend, *The Law of Evidence in Virginia* § 69 (3d ed. 1988). This rule is in accord with the federal standard, articulated in *Kastigar*, that the "immunity granted" must be "coextensive with the scope of the privilege" and "as comprehensive as the protection afforded" by it. *Kastigar*, 406 U.S. at 449.

Although this concept of co-extensive immunity does not require absolute immunity from prosecution before testimony may be compelled, the witness must be provided nothing less than the protection guaranteed by the constitutional privilege. Use immunity, derivative use immunity and transactional immunity are species of immunity that have developed as government has attempted to balance constitutional safeguards with the needs of sound public policy. *Id.*; *Caldwell v. Commonwealth*, 8 Va. App. 86, 88-89, 379 S.E.2d 368, 370-71 (1989).

Use immunity protects the witness only from "the use of the specific testimony compelled from him under the grant of immunity," but not from evidence obtained as a result of such testimony. *Kastigar*, 406 U.S. at 449-50; *Caldwell*, 8 Va. App. at 88-89, 379 S.E.2d at 370-71. Courts have recognized that witnesses protected only by use immunity may be pursued by prosecutors with evidence indirectly derived from compelled testimony and, consequently, have found it inadequate to overcome an assertion of the privilege. *Counselman v. Hitchcock*, 142 U.S. 547, 585-86 (1892); *Temple*, 75 Va. at 900; *Cullen*, 65 Va. (24 Gratt.) at 635-36.

Derivative use immunity prohibits use against the witness of evidence even indirectly obtained from his testimony, while transactional immunity accords complete immunity from prosecution to the witness for the offense related to compelled testimony. *Kastigar*, 406 U.S. at 453; *Caldwell*, 8 Va. App. at 88-89, 379 S.E.2d at 370. Unlike use immunity, the protection against self-incrimination provided by each has been found consonant and co-extensive with constitutional safeguards and, thus, sufficient to supplant the privilege. *Kastigar*, 406 U.S. at 453; *see Flanary*, 113 Va. at 780-81, 75 S.E. at 291; *Kendrick*, 78 Va. at 496.

Code § 19.2-270 provides that "evidence shall not be given against the accused of any *statement* made by him . . . upon a legal examination." (emphasis added). This statute, by its terms, confers only use immunity. A prosecutor, "without using one word

of that statement," might "be led by the testimony of the witness to means and sources of information which might result in" self-incrimination. *Cullen*, 65 Va. (24 Gratt.) at 635. Such limited protection is obviously not co-extensive with the constitutional privilege and cannot overcome it, once validly asserted.

Defendant's reliance upon *O'Dell v. Commonwealth*, 234 Va. 672, 364 S.E.2d 491, *cert. denied*, 488 U.S. 871 (1988), and *Cunningham v. Commonwealth*, 2 Va. App. 358, 344 S.E.2d 389 (1986), as authority that Code § 19.2-270 supplants the constitutional privilege, is misplaced. In *Cunningham*, the witness admitted that his refusal to testify did not result from any fear of self-incrimination. 2 Va. App. at 362-63, 344 S.E.2d at 391. The issue in *O'Dell* arose when defendant excused a witness available to him at trial and later complained that the witness' privilege against self-incrimination, though neither asserted nor tested, would have prevented his testimony. 234 Va. at 704, 364 S.E.2d at 509. Here, the statutory immunity is directly tested by the privilege.

■ Immunity is an issue, however, only if the privilege is properly available to the witness. The privilege was intended to avoid the actual " 'hazard of incrimination' " and a witness is not free to frustrate the judicial process by simply asserting it, *ipse dixit*. *North Am. Mortgage Investors v. Pomponio*, 219 Va. 914, 918, 252 S.E.2d 345, 348 (1979) (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)). When a witness

> declares his belief that the answer to the question would criminate, or tend to criminate him, the court cannot compel him to answer, unless it is *perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer *cannot possibly* have such tendency.

*Temple*, 75 Va. at 898.

■ In this analysis, the court may not compel the witness to answer, and thereby violate the privilege, but must consider the proposed question and its incriminating implications. *Pomponio*, 219 Va. at 919, 252 S.E.2d at 348; *Kendrick*, 78 Va. at 493-94. If " 'a prosecutor, building on [a] seemingly harmless answer, might proceed step by step to link the witness with some crime,' " under a " 'course and scheme of linkage' " which is not " 'incredible,' "

exercise of the privilege must be sustained. *Pomponio*, 219 Va. at 919, 252 S.E.2d at 348. Once such circumstances are established, the privilege rests with the witness and its assertion must be honored by the court. *Kendrick*, 78 Va. at 493-94; *see Johnson v. Riddle*, 222 Va. 428, 431, 281 S.E.2d 843, 846 (1981).

■ The record discloses that the trial court properly heard and considered several questions that defendant proposed to ask Hamrick, recognized an incriminating dimension to the inquiries and honored the witness' silence. Since it is the question, and not the anticipated answer, that is relevant to a ruling on the privilege, defendant's proffer of expected responses was correctly refused by the court. *See Worrells v. Commonwealth*, 212 Va. 270, 271-72, 183 S.E.2d 723, 724 (1971).

Lastly, defendant argues that the integrity of the Commonwealth's evidence was so compromised by irregularities in the chain of custody that neither the marijuana nor the results of its analysis were admissible. Evidence of the "physical or chemical properties of an item . . . requires proof of the chain of custody" to establish " 'with reasonable certainty' " that the material was not " 'altered, substituted, or contaminated' " prior to its analysis. *Reedy v. Commonwealth*, 9 Va. App. 386, 387, 388 S.E.2d 650, 650-51 (1990) (quoting *Washington v. Commonwealth*, 228 Va. 535, 550, 323 S.E.2d 577, 587 (1984), *cert. denied*, 471 U.S. 1111 (1985)). Obviously, it is the period preceding the analysis that is crucial to this determination. *Id.* at 391-92, 388 S.E.2d at 650-51. Once reasonably certain that the evidence analyzed was the same evidence originally collected and submitted, the report in this instance was admissible "as evidence of the facts therein stated and the results of the analysis . . . referred to therein." Code § 19.2-187.

While the record reflects that some confusion may have occurred in the post-analysis repackaging and return of the evidence from the laboratory, this problem related to the articles themselves, not the certificate of analysis. The trial court properly addressed each item, admitted some for expressly limited purposes, and carefully admonished the jury in this regard. The weight, if any, to be accorded to such physical evidence was a matter for the jury to resolve after a consideration of all the circumstances. *Reedy*, 9 Va. App. at 391, 388 S.E.2d at 653. Without question, however, the chain of custody prior to analysis was clearly estab-

lished by the Commonwealth and the analysis itself was properly received by the trial court.

Accordingly, we affirm the judgment of conviction.

*Affirmed.*

Willis, J., concurred.

Benton, J., dissenting.

When Gosling's counsel asked permission to proffer for the record the witness' testimony, the Commonwealth's attorney objected on the grounds that the witness' conversation with Gosling's counsel "wasn't given under oath," that the Commonwealth "would not have a chance of cross examination," and that by making a proffer, Gosling's counsel "puts himself in the position . . . of actually becoming involved as a corroborative witness" in a future prosecution of the witness. In response, Gosling's counsel advised the court that he had no lawyer-client relationship with the witness and that a proffer was appropriate. Apparently, however, the trial judge believed that if Gosling's counsel proffered the witness' testimony for the record, Gosling's counsel would have to be removed from the pending case. Based on the view that the Commonwealth would use the proffer against the witness and on a misapprehension of the function of the proffer, the trial judge ruled as follows:

You know the rule. When a lawyer starts being a witness, he has got to get out of the case at that point and I'm not going to let you out at this point for the purpose of saying what the witness may or may not have told you. I don't know what you would put on but I'm not going to let you do it.

The ruling was erroneous.

The rule has long been established that when an objection is sustained and evidence is excluded, the content of the excluded testimony may be included in the record by a proper proffer. *Driver v. Hartman*, 96 Va. 518, 520, 31 S.E. 899, 899 (1898). Thus, whenever "a question is asked and the witness is not permitted to answer it," the proponent of the evidence must make a proffer of the expected answer in order to preserve the issue for appeal. *Jackson v. Commonwealth*, 98 Va. 845, 846-47, 36 S.E. 487, 488 (1900). This procedure must be followed because "an

appellate court has no basis for adjudication unless the record reflects a proper proffer." *Whittaker v. Commonwealth*, 217 Va. 966, 968, 234 S.E.2d 79, 81 (1977). On numerous occasions, the Supreme Court and this Court have invoked the rule to bar consideration of issues on appeal. *See Wyche v. Commonwealth*, 218 Va. 839, 842, 241 S.E.2d 772, 775 (1978); *Owens v. Commonwealth*, 147 Va. 624, 630-31, 136 S.E. 765, 767 (1927); *Klein v. Klein*, 11 Va. App. 155, 160, 396 S.E.2d 866, 869 (1990); *Lowery v. Commonwealth*, 9 Va. App. 304, 307, 387 S.E.2d 508, 510 (1990); *Stultz v. Commonwealth*, 6 Va. App. 439, 444, 369 S.E.2d 215, 218 (1988).

In the absence of abusive conduct by counsel, it is difficult to conceive of circumstances in which the trial judge appropriately may categorically deny counsel the right to proffer for the record testimony that the trial judge has refused to admit or that has otherwise been excluded by a ruling of the trial judge. Any such action by the trial judge has the effect of frustrating the very rule designed to ensure review of the trial judge's ruling. Solely because of the trial judge's refusal to allow the proffer, this Court is now unable to determine on this appeal whether the trial judge erred in refusing to compel the witness to testify.

"[T]he privilege against self incrimination . . . 'is purely a personal privilege of the witness' . . . [and] a refusal to answer cannot be justified by a desire to protect others from punishment." *Rogers v. United States*, 340 U.S. 367, 371 (1951). Moreover, the privilege against self-incrimination protects the witness "against real dangers, not remote and speculative possibilities." *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478 (1972). "[The] protection [against self-incrimination] must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486 (1951).

To sustain a witness' invocation of the privilege, it is not enough that the witness merely utter the words or have a subjective belief that the answer may tend to incriminate.

The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself — his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is

justified, and to require him to answer if "it clearly appears to the court that he is mistaken."

*Id.* at 486 (citations omitted). Obviously, the trial judge in deciding whether the witness could properly invoke the privilege must consider the broad scope of the case and the facts. *Id.* An important ingredient of that determination is the scope of the questions. *See Worrells v. Commonwealth*, 212 Va. 270, 271-72, 183 S.E.2d 723, 724 (1971). Equally as important, however, is an inquiry into "what a truthful answer might disclose." *Zicarelli*, 406 U.S. at 480. "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman*, 341 U.S. at 487-88.

An examination of the record establishes that the trial judge neither relied on the facts of this case nor the witness's circumstances when he allowed the witness to invoke the fifth amendment. Rather, the record indicates that the trial judge considered nothing more than the witness' claim that his answers might incriminate him in finding that the fifth amendment was properly invoked. Nowhere in the record does the trial judge actually appraise the witness' claim. When Gosling's counsel attempted to proffer the witness' expected testimony, the trial judge merely stated, "I don't know what you would put on but I'm not going to let you do it." There is no indication, beyond the witness's subjective belief, that the witness was entitled to invoke the fifth amendment privilege.

The trial judge's refusal to allow Gosling's counsel to proffer on the record the full scope of the inquiry as well as the responses he expected to elicit precluded the trial judge from making an informed appraisal of the witness' right to invoke the protection of the fifth amendment right against self-incrimination. More importantly, the ruling has deprived this court of the basis upon which to determine whether the trial judge erred in not compelling the witness to testify. That the witness has invoked the protection of the fifth amendment is not a sufficient basis upon which to deny counsel the right to place on the record a proffer of expected testimony. Indeed, in *Worrells*, where the factual setting was analogous to the circumstances of this case, the Supreme Court ad-

dressed the dilemma that an appellate court faces on appeal when no proffer is made on the record.

> The defendant's assignments of error present . . . questions which merit discussion. The first is whether the trial court erred in refusing to allow the defendant to question Allen Guill after the latter, who had been summoned, called, and sworn as a defense witness, had invoked his Fifth Amendment privilege against self-incrimination and refused to testify. Guill, who was under indictment in connection with the incident at Briar Patch Inn, was excused as a witness upon his general assertion "that any testimony that he might give" might tend to incriminate him.
>
> The defendant contends that he should have been permitted to pose individual questions to the witness and if Guill asserted his Fifth Amendment privilege against answering any such questions, then the court could have determined whether the answers thereto would have been incriminating. With this contention, as a general proposition, we would agree. It does not necessarily follow, however, that the failure of the trial court to follow such a course in this case constituted reversible error.
>
> The defendant did not proffer to the trial court the individual questions he desired to pose to the witness. We are unable to determine, therefore, whether such questions would have been relevant and, if so, whether the witness should have been required to answer them. Given the evidence, as previously outlined, of Guill's alleged participation in the events at Briar Patch, it is conceivable that any relevant question could have elicited an answer which might have tended to incriminate the witness. In the absence of proffer of a relevant question calling for a nonincriminating answer, we will not reverse for the alleged error in excusing Guill as a witness upon the general assertion of his Fifth Amendment privilege.

212 Va. at 271-72, 183 S.E.2d at 724 (citations omitted). *See also Johnson v. Riddle*, 222 Va. 428, 431, 281 S.E.2d 843, 846 (1981) (testimony of witness who invoked the privilege against self-incrimination "was proffered out of the presence of the jury to. determine its extent and character").

"The test to be applied by an appellate court where an offer [of proof] has been denied is whether any conceivable answer to the question would have been admissible." *Frisone v. United States*, 270 F.2d 401, 403 (9th Cir. 1959). Here, the possibility of an admissible answer is immediately obvious. The evidence before the trial judge suggested that the witness was a mere bystander who observed an occurrence between Gosling and another inmate. Certainly, the witness might have been in a position to testify truthfully that he did not know the contents of the cigarette package or that he saw another inmate put contraband in the package while standing in the line or that he learned of the contents of the package after Gosling's arrest. While it is also possible that the witness may have had guilty knowledge and, thus, was in fact entitled to invoke the privilege, that possibility is no more probable than the hypothesis that the witness had knowledge that would have incriminated another inmate, but not himself, and, thus, inappropriately invoked his right not to testify.

What we do know from the record is that Gosling's counsel had spoken with the witness twice prior to trial and was capable, if permitted, of placing on the record the questions that he intended to ask the witness and the expected responses. Only if that had occurred could the trial judge have made an informed decision whether counsel should have been appointed for the purpose of consulting with and advising the witness or whether the witness should have been allowed to invoke the privilege against self-incrimination. These were matters that should have been determined only after an appropriate inquiry.[3] Without jeopardizing the witness' right not to incriminate himself, the trial judge should

---

[3] In the absence of the proffer and an appropriate inquiry, I believe it is premature to reach the issues concerning the scope of Code § 19.2-270 and the trial judge's authority to grant, sua sponte, Code § 19.2-270 immunity to the witness. Although the Supreme Court in *O'Dell v. Commonwealth*, 234 Va. 672, 704, 364 S.E.2d 491, 509 (1988), cites favorably *Cunningham v. Commonwealth*, 2 Va. App. 358, 344 S.E.2d 389 (1986), for the proposition that Code § 19.2-270 is available to compel testimony from a witness who has invoked the fifth amendment privilege against self-incrimination, it should be noted that in *Cunningham*, this Court did not approve or disprove the trial judge's grant of Code § 19.2-270 immunity to the witness. Neither Cunningham nor the Commonwealth raised that issue or complained of the manner in which the witness was granted immunity. Although the majority opinion in *Cunningham* recited the grant of immunity in discussing the factual and procedural posture of the case, *id.* at 363, 344 S.E.2d at 392, we had no occasion to address the scope or propriety of the grant of immunity under the circumstances which were existing in *Cunningham*.

have attempted to determine whether the witness had a legitimate privilege. *See People v. Poma*, 96 Mich. App. 726, 732, 294 N.W.2d 221, 223 (1980). In any event, that determination should have been prefaced by an adequate explanation of the self-incrimination privilege so the witness would have been informed that the privilege could not be invoked to protect third parties and the witness could have made "a knowledgeable choice regarding assertion" of the privilege. *Id.*

For these reasons, I would hold that the trial judge erred in denying Gosling's counsel the right to proffer for the record the anticipated testimony of the witness. In the absence of the proffer and an inquiry, the trial judge could not determine whether the witness was privileged not to answer. The refusal to allow Gosling's counsel to make the proffer by an appropriate avowal of expected testimony should not be sanctioned by this Court.