THACKER, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority’s conclusion that the Commonwealth failed to satisfy the terms of the district court’s conditional writ in this case, as set forth in Part III.A. of the majority opinion. I cannot, however, agree with its conclusion that the district court abused its discretion in barring re-prosecution of Justin Wolfe — an appropriate remedy in my view, in light of the Commonwealth’s continued misconduct and resulting threat to Justin Wolfe’s constitutional right to a fair trial.
The majority does not “exclude the possibility that a federal habeas court — in an *292 extremely rare and unique circumstance — might proscribe a state court retrial even though the constitutional violation could be thereby remedied,” but it is “unwilling to embrace” that principle in this case. Ante at 290-91 (emphasis added). I am willing to do so; in fact, for the reasons that follow, the extremely rare and unique circumstances of this case command a bar on re-prosecution. The Commonwealth’s misconduct has continued far too long, and the cumulative misconduct permeating this case has tainted it in such a way that it is doubtful Wolfe will receive a fair and just trial. Enough is enough.
Accordingly, and for the reasons set forth herein, I dissent as to Part III.B.
I.
The Supreme Court of the United States has stated, simply and repeatedly, “[t]he role of a prosecutor is to see that justice is done.” Connick v. Thompson, — U.S. -, 131 S.Ct. 1350, 1365, 179 L.Ed.2d 417 (2011). “It is as much [a prosecutor’s] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.” Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).
Mindful of this court’s admonishment, “federal court equitable interference with state criminal proceedings should not be undertaken except in the most narrow and extraordinary of circumstances,” Gilliam v. Foster, 75 F.3d 881, 903 (4th Cir.1996) (en banc) (citing Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)), I nonetheless cannot ignore the ways in which the Commonwealth’s misconduct has hindered rather than fostered justice throughout the course of this case. Although the “extraordinary circumstances” exception is narrow, this case— wherein the Commonwealth’s conduct has been appalling — fits squarely into that narrow space.
A.
1.
I begin with the elementary propositions that habeas corpus is, “at its core, an equitable remedy,” Schlup v. Delo, 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and a district court has broad discretion to “dispose of habeas corpus matters ‘as law and justice require,’ ” Hilton v. Braunskill, 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987) (quoting 28 U.S.C. § 2243). See also Irvin v. Dowd, 366 U.S. 717, 728-29, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). For these reasons, our review of a district court’s decision to bar re-prosecution is circumscribed. See D Ambrosio v. Bagley, 656 F.3d 379, 390 (6th Cir.2011) (stating that a district court’s decision to bar re-prosecution would be reviewed for abuse of discretion).
Under an abuse of discretion review, we should not disrupt the court’s remedy unless we believe it “act[ed] arbitrarily or irrationally, fail[ed] to consider recognized factors constraining its exercise of discretion, relie[d] on erroneous factual or legal premises, or commit[ted] an error of law.” United States v. Wilson, 624 F.3d 640, 649 (4th Cir.2010) (internal quotation marks omitted).
2.
As the majority notes, see ante at 289, the extraordinary circumstances exception has traditionally surfaced in cases in which a constitutional violation cannot be remedied by a new trial. See, e.g., Gilliam, 75 F.3d at 903 (re-prosecution would contravene the Double Jeopardy Clause); Solem v. Bartlett, 465 U.S. 463, 481, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) (state court lacked jurisdiction over the prosecution); *293 Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (petitioner was convicted under an unconstitutional statute); Strunk v. United States, 412 U.S. 434, 439-40, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973) (re-prosecution would violate petitioner’s right to a speedy trial).
But some courts have also found the remedy appropriate in cases in which “other exceptional circumstances exist such that the holding of a new trial would be unjust.” Capps v. Sullivan, 13 F.3d 350, 352-53 (10th Cir.1993). These courts have relied on circumstances that demand equitable relief, even if those circumstances present constitutional violations that could be remedied upon retrial. For example, in Satterlee v. Wolfenbarger, the Sixth Circuit held that a district court “may forbid re-prosecution” where “the state inexcusably, repeatedly, or otherwise abusively fails to act within the prescribed time period,” or “the state’s delay is likely to prejudice the petitioner’s ability to mount a defense at trial.” 453 F.3d 362, 370 (6th Cir.2006) (internal quotation marks and alterations omitted). See also Wiggins v. Estelle, 681 F.2d 266, 268 n. 1 (5th Cir.1982) (suggesting petitioner should “forever be set free” if pre-indictment delay denied petitioner due process), rev’d on other grounds, McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); United States ex rel. Schuster v. Vincent, 524 F.2d 153, 154, 158, 162 (2d Cir.1975) (ordering a habeas petitioner’s immediate release and absolute discharge where he had been confined in a state hospital for over 30 years vuthout the opportunity for a commitment hearing and had been in prison for a total of 44 years); Garcia v. Portuondo, 459 F.Supp.2d 267, 294 (S.D.N.Y.2006) (A court may bar retrial, even if the constitutional violation is capable of correction, “where the petitioner has served an extended and potentially unjustifiable period of incarceration before the writ was granted.” (internal quotation marks and alterations omitted)); Morales v. Portuondo, 165 F.Supp.2d 601, 609 (S.D.N.Y.2001) (barring retrial where “the evidence strongly suggests that [the petitioners] are innocent,” their “ability to defend against the charges in any new trial has been hampered” by unavailability of witnesses because of the state’s delay, and they have “served extended and potentially unjustified periods of incarceration” (internal quotation marks omitted)).
Whether circumstances are “extraordinary” enough to bar re-prosecution is a fact-based determination, left to the sound discretion of the district court. See Foster v. Lockhart, 9 F.3d 722, 727 (8th Cir.1993) (“A district court has authority to preclude a, state from retrying a successful habeas petitioner when the court deems that remedy appropriate.”). In this case, I do not agree that the district court abused that discretion: I am not as confident as the majority that the Commonwealth’s Brady and Giglio violations and subsequent misconduct can be remedied in a new trial. But even assuming they can be, the circumstances at hand are extraordinary enough to demand, equitable relief in the form of a bar on re-prosecution.
B.
The district court’s remedy was set forth in the Order Enforcing Judgment as follows:
The Commonwealth, having violated the Court’s conditional writ of habeas corpus by failing to “within one-hundred and twenty (120) days of the date of this Order, provide Petitioner with a new trial, or release him unconditionally from custody,” it is ORDERED that the Commonwealth of Virginia release Petitioner unconditionally,-free of all criminal proceedings on the charge of murder for *294 hire of Danny Petrole and the drug .charges that were previously tried in state court by the Commonwealth, within ten (10) days of the entry of this order.
It is FURTHER ORDERED that the Commonwealth of Virginia is hereby BARRED from reprosecuting the Petitioner on the charges originally tried herein in state court or any other charges stemming from death of Danny Petrole which requires the testimony of Owen Barber in any form.
J.A. 534-35. The district court explained,
As a starting point, the Court fully concedes that had the content of the Petitioner’s Motion to Enforce Judgment been strictly limited to the Commonwealth’s violation of the deadline set in this case, the question of the appropriate remedy would be an easy one. The Court would order Wolfe’s release, but he would be subject to rearrest and reprosecution by the Commonwealth. However, the reality of this case is very different than that of the ordinary case which constrains the Court to extraordinary remedies.
Id. at 525. The court proceeded to discuss two aspects of Wolfe’s case that warranted a bar to re-prosecution: the Commonwealth’s continuing pattern of misconduct, including flagrant and ubiquitous violations of Brady and Giglio-, and the Commonwealth’s 'jail visit to Owen Barber on September 11, 2012.
1.
First, I am compelled to set forth a sampling (though certainly not all) of the previous instances of misconduct perpetrated by the Commonwealth:
• The Commonwealth withheld the report composed by Detective Sam New-some (the “Newsome Report”), which specifically stated, “I told [Barber] that he was potentially facing a capítol [sic] murder charge in this case and that he needed to help himself.... I told him I could not make any promises to him, but that the Commonwealth might entertain the idea of not charging him with Capitol [sic] Murder[.]” Wolfe v. Clarke, 691 F.3d 410, 417 (4th Cir.2012) (“Wolfe II”). The Newsome Report also showed that the first mention that Wolfe had anything to do with Petrole’s murder was raised by Detective Newsome, not by Barber himself;
• The Commonwealth withheld evidence that Barber possessed potential motives for murdering Petrole, see Wolfe v. Clarke, 819 F.Supp.2d 538, 565 (E.D.Va.2011);
• The Commonwealth withheld evidence that Barber’s roommate, Jason Coleman, informed the prosecution that Barber had confessed to acting alone, see id.-,
• The Commonwealth withheld evidence suggesting that Barber knew Petrole before the murder, that Barber owed Petrole money, that Petrole “had a hit out” on Barber, and that Barber had a close relationship with Petrole’s roommate, id. at 548 — 49, 552;
• The Commonwealth withheld impeachment evidence, including information relating to a deal the Commonwealth made with its witness J.R. Martin in exchange for his cooperation, see id. at 549;
• The Commonwealth withheld a recorded statement made by its witness Chad Hough that conflicted with his trial testimony, see id. at 549;
• The Commonwealth withheld evidence which could have allowed Wolfe to present an alternate theory of the Pe-trole murder: various reports and witness statements relating to a parallel *295 drug investigation that indicated conflict in Petrole’s drug business unrelated to Wolfe’s purported motive for having Petrole murdered; evidence that Petrole was rumored to be a government informant, constituting yet another possible motive for his murder; and the statements of three witnesses that they saw a second car at the crime scene shortly after the Pe-trole murder, see id. at 566, 558-59;
• When questioned why his office does not have an “open-file policy,” a Commonwealth prosecutor offered “the flabbergasting explanation that he has ‘found in the past when you have information that is given to certain counsel and certain defendants, they are able to fabricate a defense around what is provided.’ ” Wolfe II, 691 F.3d at 423. Thus, in Wolfe II, we found that the suppression of the Newsome Report “as well as other apparent Brady materials, was entirely intentional,” id.)
• The district court found, “[t]he prosecutors choreographed and coordinated witness testimony through a series of joint meetings with Owen Barber and J.R. Martin, Owen Barber and Jennifer Pascquierllo and Jason Coleman and Chad Hough.” Wolfe, 819 F.Supp.2d at 547. Further, the prosecutors did not provide any reference to or information regarding the joint meetings with witnesses in their written Brady disclosure, see id.;
• “Sergeant Pass, lead officer of the drug investigation relating to Wolfe and Petrole, submitted reports outlining the investigation of Petrole and others’ drug activities to both the prosecutors and homicide investigators. Conway did not review all of the reports dealing with the drug investigation and he did not provide them to Petitioner,” id. (citation omitted);
• The Commonwealth used Owen Barber’s trial testimony “despite being on notice that it contained falsities,” id. at 571 (emphasis supplied);
• In attempting to circumvent the district court’s mandate that the retrial occur within 120 days or Wolfe be released unconditionally, the Commonwealth assured the state court that the “federal court expressly allows the Commonwealth 120 days from September 7, 2012, in which to institute retrial proceedings,” J.A. 260; see also ante at 282.
The gravity of this list is startling, but the pattern of misconduct does not end there: it reached its pinnacle on September 11, 2012, when Detective Newsome and Prince William County prosecutors Richard Conway and Paul Ebert (the “Original Prosecuting Team”) visited Barber in jail (the “September 11 jail visit”) and attempted to coerce Barber to repeat his 2002 trial testimony upon retrial — the same testimony that the district court found “contained falsities.” Wolfe, 819 F.Supp.2d at 571 (“Not only was the Commonwealth in possession of information that would have revealed falsities in Barber’s testimony at the time of the trial, it also knew that suppressing that information would result in denying Petitioner an opportunity to craft a defense based on the information.”).
This time, however, Barber had enough. The district court explained,
As Mr. Barber’s counsel’s testimony indicated during this Court’s December 13, 2012 hearing, Mr. Barber, under advice of counsel and in consideration of the Original Prosecuting Team’s [Sept. 11, 2012] conversation, has now invoked his Fifth Amendment privilege, which the Prince William County Circuit Judge authorized. As indicated by Barber’s counsel, Barber intends to continue to *296 invoke Ms Fifth Amendment privilege at Wolfe’s retrial, absent the granting of immunity.
J.A. 527 (citations omitted). Thus, by threatening and intimidating Barber— whose most recent and credited testimony was that Wolfe had nothing to do with Petrole’s murder — into invoking the Fifth Amendment, the Commonwealth has once again deprived Wolfe of potentially exculpatory evidence. This is a circumstance that, even if (somehow) the constitutional violations can be remedied upon retrial, is extraordinary enough “such that the holding of a new trial would be unjust.” Capps, 13 F.3d at 353.
2.
In fashioning its remedy to bar re-prosecution, the district court relied heavily upon the actions of the Original Prosecuting Team during the September 11 jail visit, so it is important to put the visit in context. This court’s Wolfe II opinion was published on August 16, 2012, and the mandate issued on Friday, September 7, 2012. Our Wolfe II opinion roundly chastised the Original Prosecuting Team for its failure to disclose exculpatory evidence and for “taint[ingj” evidence by its “prose-cutorial misconduct.” Wolfe II, 691 F.3d at 426 n. 9. At that point, the Commonwealth was well on notice that a change in the prosecution team would be necessary to avoid any continued improprieties.
Yet, the day before a meeting with Wolfe’s counsel (scheduled for Wednesday, September 12), the Original Prosecuting Team traveled to the Augusta Correctional Center and met with Barber, who was unassisted by counsel. The encounter was recorded without Barber’s knowledge. The Commonwealth states that the Original Prosecuting Team visited Barber “in preparation for the retrial,” and maintains, “Mr. Ebert was permitted, even required, to talk to Barber to see which of his many stories he intended to tell at the retrial.” Resp’t’s Br. 6, 28.
Ebert received his answer within the first five minutes of the interview: “EBERT: What might be your testimony if we were to call you this time [upon retrial]? BARBER: I guess it’d have to be what was in the Federal Court.” J.A. 298. Barber was referring to the testimony he gave at the district court evidentiary hearing in November 2010, where he reconfirmed that Wolfe was not “involved in the murder of Danny Petrole,” did not “hire [Barber] to kill Danny Petrole” and did not “have anything ... to do with the murder of Danny Petrole.” Wolfe v. Johnson, No. 2:05-cv-432, Docket No. 186 at 117-18 (Tr. Nov. 2, 2010); see also Wolfe, 819 F.Supp.2d at 548 & n. 9. Crucially, the district court found “Barber’s demean- or and candor persuasive” at the federal evidentiary hearing. Wolfe, 819 F.Supp.2d at 570.
Nonetheless, the questioning did not stop there. Instead, because this was not the answer the Commonwealth wanted, they proceeded to interrogate, intimidate, and threaten Barber for over an hour, but at no point did Barber relent.
I am compelled to repeat some of the tactics used by the Commonwealth and statements made to Barber at the September 11 jail visit:
• Conway paraphrased the holding in the Supreme Court case Ricketts v. Adamson, 483 U.S. 1 [107 S.Ct. 2680, 97 L.Ed.2d 1] (1987), explaining that a government witness who breached a plea agreement by failing to testify truthfully against other parties “was convicted of first degree murder and sentenced to death.” Conway asked, “Nobody, none of these people [i.e., Wolfe’s attorneys] ever told you that by breaching the plea agreement you *297 could be tried again also ... for the murder[?] ... I had thought it was pretty deceptive really for these people to be coming here and talking to you as if perjury was the only thing you had to worry about.” J.A. 310-14.
• DETECTIVE NEWSOME: “You know, ... sometimes you may feel like well, if I’m going down, there’s no need to take [Wolfe] with me. So I’ll just tell this lie to make it easier on him. And I’m saying this may come from the heart in an effort to do good, to try and do good, and say well even though you may know he’s guilty, I’m just going to say this because it will make his life easier. Why should somebody else suffer also? I will take the brunt of this. But justice doesn’t work like that. And nor does God work like that. We are held accountable for our actions. Scripture tells us to obey the laws of the land. We have an obligation to do that. And our obligation before anything else is to be righteous and truthful in our practices and in what we do. And we’re told in scripture also that those with authority over us are put there by holy mandate. So we have an obligation to respect the Courts, to respect the process and to do what’s right. And we do not have the moral ability to arbitrarily protect those who are guilty, who are held accountable.” Id. at 331 (emphasis supplied).
• CONWAY: “It doesn’t matter what the victim’s family thinks about now because we’ve gotten somebody off of death row so it’s a victory and the Lord will forgive us for that. But let me tell you something, I don’t know— I don’t know if the Lord’s all that forgiving or not.” Id. at 354.
• CONWAY: “I’m not trying to trick you or anything, but do you remember what you answered [when you were asked why you killed Petrole]?” BARBER: “No. What did I say?” CONWAY: “Do you know why you don’t remember? Because it wasn’t the truth.” Id. at 361.
• DETECTIVE NEWSOME: “You know, what Mr. Conway said about do you think if you told the truth that you could convince somebody that it’s the truth.... But this is something that you and you alone can have an impact on and it has to come from in there. And that is a plausible and truthful explanation for those multitude of changes. A plausible and truthful explanation of why you told the truth in the initial trial, you told the truth in letters, but in these affidavits, why you changed. It has to be truthful and plausible[.]” Id. at 367-68.
• CONWAY: ‘You know what the truth is, Owen. It’s something that we should have ingrained in you more, I guess, back then. We thought we had.” Id. at 369.
• CONWAY: “So you need to really search your sole [sic] and if we’re full of shit and Justin Wolfe didn’t have anything to do with all this, you should tell us that right this minute and tell us to get out because you did it all on your own and he never had a thing to do with it. But if you wanri — if you believe in yourself and you believe in the truth and that you believe that from now on nothing but the truth will ever escape your lips, then I think that’s different.” Id. at 370-71.
• EBERT: “One more thing I want you to think about, what do you think your mother would want you to do?” Id. at 375. (Barber’s mother died of cancer a year before Barber killed Petrole, and the Original Prosecuting Team *298 knew this fact because they read aloud a previous statement of Barber’s, which said, “I had just lost my mother the year before [Petrole’s death] after cancer [was] slowly eating her away,” id. at 302).
The very next day, on September 12, 2012, Conway and Ebert filed an ex parte motion to recuse themselves and were replaced on September 13 by a Fairfax County Commonwealth prosecutor. The timing of this action is highly suspect, as it suggests that, rather than working diligently to comply with the district court’s mandate that Wolfe be released or retried within 120 days, the Original Prosecuting Team made a last-ditch effort to intimidate Barber into implicating Wolfe once and for all, and then, when their plans failed, the prosecutors immediately filed a motion to recuse themselves.[1]
Considering this cumulative evidence of misconduct, culminating in the Commonwealth urging Barber to reiterate testimony that “contained falsities,” and his resulting intention to invoke his Fifth Amendment privilege, I simply cannot join the majority’s independent finding that this is not an “extremely rare” situation worthy of a bar on re-prosecution. Ante at 289. Woe is the state of justice in the Commonwealth if this behavior is not extremely rare.
3.
The majority makes the point that Barber may very well not end up invoking his Fifth Amendment privilege, and if he does testify, his testimony could benefit either side. See ante at 288. However, in my opinion, this misses the point. The September 11 jail visit, resulting in Barber’s threat of silence, was not an anomaly; it “permanently crystalized” the misconduct of the Original Prosecuting Team, J.A. 533, as the district court explained,
In the absence of the discovery violations in the state trial, the Original Prosecuting Team’s actions on September 11, 2012 might appear to be benign. However, in context, they speak to a continuing pattern of violating Petitioner [sic] right to use Brady and Giglio evidence, which the Court attempted to remedy through its habeas decree.
Id. at 528.
As it stands, the only witness directly linking Wolfe to the death of Petrole— Barber — has now recanted and, as a result, has been sought out and harassed by the Commonwealth attorneys to the extent he is now chilled from testifying. In fact, in December 2012, Barber’s attorney testified in district court that, upon his advice, Barber has already invoked his Fifth Amendment privilege in state court, and “based on the contents of th[e] tape [from the September 11 jail visit], my advice will not change about whether [Barber] should testify [at trial] unless there’s a new development!.]” J.A. 471-72.
But even if Barber decides to forego the privilege, his testimony will be forever shadowed by the manipulative actions of *299 the Original Prosecuting Team: the Commonwealth threatened Barber with being charged with capital murder for breaching his plea agreement and raised the specters of God and Barber’s deceased mother in attempt to coerce him into testifying to “the truth,” a.k.a., the Commonwealth’s moniker for its version of the facts. See J.A. 310-14, 331, 369, 375. It is the Commonwealth alone that now holds the fate of the crucial Barber testimony (and thus, Wolfe’s fate) in its grip. They alone can grant immunity (or not) in order to compel Barber’s testimony.[2] Yet, it is clear from the actions and statements of the Commonwealth prosecutors that the only testimony they are interested in compelling is that which would implicate Wolfe.
The misconduct of the Original Prosecuting Team has tainted this case to the extent that Wolfe’s due process rights are all but obliterated. In this case, with its “protracted and eventful history,” ante at 279, not only do we have inexcusable delay as set forth in Satterlee, Garcia, and Morales — caused by the Commonwealth’s withholding of Brady and Giglio evidence and its non-compliance with the district court’s 120-day deadline — but we also have the grievous instances of prosecutorial misconduct to boot. Wolfe has been in prison for twelve years, despite the fact that the evidence linking him to Petrole’s murder is weak, and he will now likely be deprived of live testimony from the only direct witness to the crime for which he is sitting on death row — testimony that may very well exculpate him. Thus, the district court was not arbitrary or irrational, did not ignore constraints on its discretion, and did not commit factual or legal error in stopping this loathsome spectacle once and for all. See United States v. Wilson, 624 F.3d 640, 649 (4th Cir.2010).[3]
II.
In sum, the district court — possessing jurisdiction to remedy the constitutional *300 violations that occurred over the past twelve years and armed with the authority to “enfore[e] its conditional grant of a writ of habeas corpus,” Gentry v. Deuth, 456 F.3d 687, 692 (6th Cir.2006) — disposed of this matter “as law and justice require[d],” 28 U.S.C. § 2243, and did not abuse its discretion in barring re-prosecution of Justin Wolfe. I would affirm the district court’s remedy and thus, respectfully dissent as to Part III.B. of the majority opinion.
I repeat the words of our Supreme Court, “It is as much [a prosecutor’s] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.” Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Even Detective New-some recognized that the Commonwealth “ha[s] an obligation to respect the Courts, to respect the process and to do what’s right.” J.A. 331. If only the Commonwealth had practiced what it preached.

. The district court asked the Commonwealth, "Did the [prosecutors’] recusal on September the 12th have anything to do with the visit on September 11th of Mr. Barber?” The Commonwealth, represented by the Attorney General’s Office, responded, "I can only speak to the record, your Honor. There's nothing I see in the transcript or in my listening to the recording of the visit that would have created the basis for them to recuse themselves.” J.A. 456. The Commonwealth continued, "[T]he history of the case to that point and the criticism that had been leveled at them would be a distraction in continuing the prosecution of the case, and a special prosecutor would be able to focus on the case itself,” to which the court responded, "It took the Commonwealth until September the 12th to figure that out?" Id. at 457.

. I am not satisfied by the suggestion that a state court grant of immunity would result in Barber offering testimony. See Gosling v. Commonwealth, 14 Va.App. 158, 415 S.E.2d 870, 874 (1992) ("When a witness 'declares his belief that the answer to the question would [in] criminate, or tend to [in] criminate him, the court cannot compel him to answer, unless it is perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer cannot possibly have such tendency.' " (quoting Temple v. Commonwealth, 75 Va. 892, 898 (1881))); see also Byrd v. Commonwealth, No. 2550-02-1, 2003 WL 23021981 (Va.Ct.App. Dec. 30, 2003) ("Even had the trial court granted Spain use immunity, however, it could not compel him to testify if he decided to assert his Fifth Amendment privilege.” (citing Gosling, 415 S.E.2d at 873; Va.Code Ann. § 19.2-270)).

. The majority maintains, “contentions relating to Barber’s alleged intimidation by the prosecutors are yet to be exhausted in the state court system.” Ante at 289 (citing Pitchess v. Davis, 421 U.S. 482, 95 S.Ct. 1748, 44 L.Ed.2d 317 (1975)). However, Pitchess is inapposite. As noted in Part III.A. of the majority opinion, the (Continued) Commonwealth did not comply with the conditional writ in this case. In such a situation, jurisdiction remains in the district court so that it may "enforce its conditional grant of a writ of habeas corpus.” Gentry v. Deuth, 456 F.3d 687, 692 (6th Cir.2006); see also D’Ambrosio v. Bagley, 656 F.3d 379, 385 (6th Cir.2011) ("[T]he state never complied with the conditional writ, and the district court’s jurisdiction remained intact[.]”). In Pitchess, the state complied with the district court's writ, thereby depriving the district court of jurisdiction over further proceedings and rendering exhaustion of the utmost importance. In contrast, because the September 11 jail visit occurred while the Commonwealth was under the thumb of the district court’s writ, Pitchess’s exhaustion requirement does not preclude the district court’s consideration of the September 11 jail visit in deciding how best to fashion a remedy for failure to satisfy its own writ.